**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**DEC 27 2000**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

JIMMY LEE MAYNARD,

Defendant-Appellant.

No. 99-5094

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA
(D.C. No. 98-CR-21-C)

---

R. Thomas Seymour (C. Robert Burton and F. Randolph Lynn with him on the brief), of
R. Thomas Seymour, Attorneys, Tulsa, Oklahoma, for Appellant.

Allen J. Litchfield, Assistant United States Attorney, Northern District of Oklahoma,
(Stephen C. Lewis, United States Attorney, with him on the brief), Tulsa, Oklahoma, for
Appellee.

---

Before **TACHA**, **HOLLOWAY** and **BALDOCK**, Circuit Judges.

---

**HOLLOWAY**, Circuit Judge.

---

Defendant/Appellant Jimmy Lee Maynard appeals his conviction for operating a

continuing criminal enterprise in violation of 21 U.S.C. § 848. The Second Superseding

indictment charged in Count One that beginning in or around 1988 in the Northern

District of Oklahoma and elsewhere, Maynard knowingly engaged in a continuing series of felony violations which constituted a continuing criminal enterprise by committing offenses of conspiracy to possess with intent to distribute and distribution of methamphetamine, a Schedule II controlled substance, and to manufacture or attempt to manufacture methamphetamine, in violation of 21 U.S.C. § 846, as set forth in Count Two of the Indictment.  The continuing violations were alleged to have been knowingly and intentionally undertaken by Jimmy Maynard in concert with five or more persons, with respect to whom Maynard occupied a position of organizer, supervisor, and other positions of management.  The indictment alleged that Maynard obtained from the violations substantial income or resources, all in violation of 21 U.S.C. § 848 (a), (c) and (d).

Count Two alleged that Jimmy Maynard and several other defendants knowingly and intentionally conspired to commit offenses against the United States in violation of 21 U.S.C. § 841 (a)(1) and (d)(1)(A), namely possession with intent to distribute and manufacture methamphetamine, all in violation of 21 U.S.C. § 846.  Count Two of the Second Superseding Indictment was vacated on April 19, 1999, as the judgment of April 29, 1999 reflects.  I App. at 62.

At trial, Maynard testified in his defense.  His defense was that although he had used methamphetamine, he did not sell it, and that those who testified that he did were lying.  He testified that he never sold drugs and had never been involved in any drug

conspiracy. IV App. at 776, 782, 787-88, 792, 795-97, 802. Following a lengthy jury trial, Maynard was found guilty on Count One of the Second Superseding Indictment and was sentenced on April 30, 1999 to incarceration for 360 months, a fine of $10,000, an assessment of $100, and five years of supervised release. Maynard filed a notice of appeal on April 30, 1999. We have jurisdiction under 28 U.S.C. §1291.

Maynard's appeal presents two principal claims of error: (1) that prosecutorial misconduct, which viewed as singular or cumulative error, denied him a fair trial under the Due Process Clause of the Fifth Amendment; and (2) that there was insufficient evidence, taken in the light most favorable to the government, to establish the elements of an offense under 21 U.S.C. § 848.

# I

## PROSECUTORIAL MISCONDUCT

Maynard contends that he was denied due process by a pattern of egregious prosecutorial misconduct. Specifically, Maynard alleges that the prosecutor, Assistant United States Attorney Litchfield, engaged in the following acts of misconduct: (1) deliberately and knowingly creating a false implication before the jury that Maynard caused a murder; (2) creating the false impression that Maynard had threatened a witness for testifying; (3) creating the false impression that a testifying witness was registered in a motel under a false name to protect her from Maynard; and (4) eliciting improper

testimony from a witness that Maynard had been in jail.

## A

We turn first to Maynard's most serious claim of prosecutorial misconduct, that the prosecutor asked questions of a government witness in such a way as to intentionally and falsely create the impression before the jury that Maynard had caused a murder. The improper questioning occurred as follows.

The prosecutor called to testify Mr. Reginald Eugene Patterson, then serving a twenty-seven year term in prison for manufacturing a controlled substance. II App. at 368 et seq. Patterson testified that he knew Maynard and identified him in court. Id. at 371. During direct examination, the prosecutor asked Patterson about a conversation that took place in Tulsa amongst himself (Patterson), Maynard, and Chris Henson (an associate of Maynard). Patterson testified that in the course of the conversation Maynard became very upset upon learning that Henson, unbeknownst to Maynard, had sent a "youngster," a very young man, on a drug run to California. Id. at 377.

The prosecutor then asked Patterson "what happened when Mr. Jimmy Maynard found that out?" In response, Patterson testified that "all kinds of crap broke loose." Id. at 378. The questioning then proceeded as follows:

MR. LITCHFIELD: Were you present when he found out?

PATTERSON: Yes, sir, I was.

MR. LITCHFIELD: And what did he say, Mr. Patterson?

PATTERSON: You really want –

MR. LITCHFIELD: Yes, I want you to tell us what he said.

PATTERSON: <u>I want the little son of a bitch dead. I want him dead. I want him dead now</u>.

MR. LITCHFIELD: And who said that?

PATTERSON: Jim Maynard. He threw a stereo receiver, if I remember right, too.

MR. LITCHFIELD: The defendant?

PATTERSON: Yeah.

Id. at 378 (emphasis added).

After cross-examination by defense counsel, the prosecutor conducted a very brief redirect examination, which concluded with the following exchange:

MR. LITCHFIELD: By the way, this boy that Chris Henson sent to California, where is he now?

PATTERSON: He's dead.

Id. at 387.

There was no immediate objection to this questioning or to the answers given. However, immediately after this testimony defense counsel asked permission to approach the bench, which was granted. Counsel then moved for a mistrial on the ground that

- 5 -

"counsel's last question is an evidentiary harpoon" intended "to show that somehow or other Jimmy Maynard is responsible for that man's death. . . ." Defense counsel emphasized that "pre-jury discussion" had been held "to avoid that kind of thing."[1] II App. at 387. The judge told the prosecutor that his questioning of Patterson implied that the young man's death was related to the prior threat and the judge said that unless the prosecutor could "connect it up, it's a very serious matter." II App. at 389. When the prosecutor said that he did not intend to follow the matter up further, the judge said he would have to take the motion for a mistrial under advisement then. Id. at 389.[2]

After the bench conference, the trial resumed before the jury, and the judge issued a curative instruction:

> In the direct examination there was a matter testified to by Mr. Patterson concerning a young man who lived across from the apartment that made a trip to California and so forth, and there was testimony by Mr. Patterson that Mr. Maynard had heard of that. You heard that testimony.
> In the redirect a question was asked, where is that young man now?

---

[1]After opening statements but before testimony, the judge warned counsel that "the thing I want to emphasize is . . . I don't want to be confronted with somebody trying to slip in things that are not appropriate. Do you understand what I'm saying?" I R. at 78.

[2]The record contains a statement by the prosecutor that defense counsel was in possession of a DEA-6 report discussing the event Patterson talked about (concerning the death of the young man who went to California); that defense counsel knew "that Mr. Patterson said it was Joe Woodson who told him that the guy had been killed, and implicated himself in the murder"; thus there was no "evidentiary harpoon" because if defense counsel wanted to follow that point up, he had had an opportunity earlier to do so and did not take advantage of it.
Defense counsel argued in support of the mistrial motion that it was totally irrelevant to bring up the point that the young man was dead and that this reference developed by the government in the testimony from Patterson was calculated to "make Mr. Maynard look bad." II App. at 388.

And the answer you all heard. I want to instruct you that you must disregard that question. There is absolutely no evidence whatsoever that that gentleman's demise was in any way associated with the defendant here on trial, and I don't want you to get the wrong impression and make an assumption that is not supported in any way by any evidence. Can each of you, and will each of you do that? You all indicate in the affirmative. Very well. All right.

Id. at 392.

Later in comments before closing arguments and out of the presence of the jury, the judge returned to the motion for a mistrial. IV App. at 841-43. The judge said he had taken the motion for a mistrial under advisement; that the question (leading to the statement that the young man was dead) was inappropriate; and that after a conference with counsel, as requested the jury was directed to disregard the answer. Id. at 842. The judge noted he went further and told the jury there was absolutely no association nor evidence that Maynard was connected to the man's demise. The judge said he watched the jury very carefully and that it was apparent "every one of them fully understood that instruction and clearly was going to disregard any inference or suggestion that could have been otherwise taken from that evidence." Id. at 842. The judge then said he considered the evidence in this case to be "very strong" and when an error has occurred, it was his responsibility to look at all the evidence to determine the possible or probable effect such an instance might have. Id. at 842. He then overruled the motion for a mistrial, but added that he expected a little more care to be followed in the manner evidence is brought before a jury. Id. at 843.

Maynard now contends that the prosecutor's conduct, and the trial judge's subsequent denial of his motion for a mistrial, denied him a fair trial in violation of the Due Process Clause of the Fifth Amendment. We review a denial of a defendant's motion for a mistrial or a new trial for prosecutorial misconduct for an abuse of discretion. United States v. Gordon, 173 F.3d 761, 769 (10th Cir. 1999) ("We review the district court's denial of a motion for new trial based on prosecutorial misconduct for abuse of discretion."); United States v. Begay, 144 F.3d 1336, 1339 (10th Cir. 1998) ("Defendant next argues that the government committed prosecutorial misconduct that denied him a fair trial. We review the denial of a motion for mistrial on these grounds for abuse of discretion."); United States v. Villa-Chaparro, 115 F.3d 797, 803 (10th Cir. 1997); United States v. Gabaldon, 91 F.3d 91, 94 (10th Cir. 1996).

We agree with the trial judge that this incident is a "very serious matter."[3] The direct implication that the defendant was connected to the young man's death was gross. Moreover, it is inescapably clear that the prosecutor knew what Patterson would say in the testimony which he developed, namely the fact of the young man's demise. Indeed, the government itself conceded in its brief that the "Patterson 'dead' statement was improper," Brief of Appellee at 42, and admitted during oral argument that the "question

---

[3]For instance in United States v. McManaman, we emphatically held that "evidence that defendants had threatened or attempted to kill government agents or informers" may "have too great a prejudicial impact . . ." and thus require a new trial. United States v. McManaman, 606 F.2d 919, 926 (10th Cir. 1979) (citing United States v. Weir, 575 F.2d 668, 671-72 (8th Cir. 1978)).

was improper." In fact, during oral argument when we asked the prosecutor "what was the justification" for his question, he conceded that "I have no good explanation for that." Moreover, the prosecutor knew full well that the young man was dead; yet, he proceeded to ask Patterson "where is he now?" During oral argument, we asked the prosector: "You knew he was dead?" He replied, "Yes."

Prosecutorial misconduct may "so infec[t] the trial with unfairness as to make the resulting conviction a denial of due process." Greer v. Miller, 483 U.S. 756, 765 (1987) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)) (alternation in original). To rise to the level of a due process violation, the prosecutorial misconduct at issue must be "of sufficient significance to result in the denial of the defendant's right to a fair trial." Id. at 765 (quoting United States v. Bagley, 473 U.S. 667, 676 (1985) (quoting United States v. Agurs, 427 U.S. 97, 108 (1976))).

However, in examining claims of prosecutorial misconduct, we have held that reversal is required "only if the improper conduct influenced the verdict." Gordon, 173 F.3d at 769; United States v. Ivy, 83 F.3d 1266, 1288 (10th Cir. 1996) ("A prosecutor's improper statement to the jury is harmless unless there is reason to believe that it influenced the jury's verdict."). Thus, "[a]bsent a showing of prejudice to the defendant, prosecutorial misconduct alone will not support a finding that the trial court abused its discretion." United States v. Novak, 918 F.2d 107, 110 (10th Cir. 1990) (citing United States v. Martinez-Nava, 838 F.2d 411 (10th Cir. 1988)). We have ruled that in

determining "whether the misconduct had such an impact, we consider the trial as a whole, including the curative acts of the district court, the extent of the misconduct, and the role of the misconduct within the case." Gabaldon, 91 F.3d at 94 (quoting Ivy, 83 F.3d at 1288). Although the prosecutor's conduct was clearly improper and rightly deserves disapproval, we believe that under this standard the trial judge's quick response and emphatic curative instruction to the jury that they disregard the prejudicial testimony was, in light of the strong prosecution case, sufficient to save this case from reversal. United States v. Sands, 899 F.2d 912, 915 (10th Cir. 1990) ("[A] cautionary instruction is not sufficient to cure the error where the error is likely to make a sufficiently strong impression on the jury that it will be unable to disregard it.").

We review below in detail the strength of the government's case when we address Maynard's insufficiency of the evidence argument, but for present purposes it suffices to say that there was an overwhelming body of evidence developed against the defendant.[4] Moreover, the trial judge promptly gave an extremely strong curative instruction to the

_____

[4] Title 21 U.S.C. § 848(c)(2)(A) requires that the defendant have acted in concert with five or more other persons with respect to whom he occupied a position of organizer, a supervisory position, or any other position of management. Maynard thus argues that misleading testimony suggesting that he caused a murder was particularly prejudicial since it augmented what he considers to be weak and ambiguous evidence of his leadership role, in that it indicated that he was the "boss" of a drug ring. Opening Brief of Appellant at 7, 12-13. We find this argument unpersuasive; as detailed below, the prosecution presented a great deal of evidence showing that Maynard functioned in a leadership capacity in organizing and directing the procurement and sale of methamphetamine. Specifically, there was evidence that Maynard directed six "mules" (Marty Sanders, Terri Kaiser, Chery Rathbun, Phllis Henson, Joe Woodson, and Glen Bartley), three "cooks" (Reginald Patterson, Charles Bowen, and Jim Schorrenberg), and two "distributors" (Carol Watts and Donna Gatewood), See, e.g., III R. at 621-22.

- 10 -

jury immediately after the bench conference following Mr. Peterson's testimony, directing that the jury "must disregard that question." The judge was also convinced that each would not "make an assumption that is not supported in any way by any evidence." II R. at 392. Further, the judge himself instructed the jury that there was "absolutely no evidence whatsoever that that gentleman's demise was in any way associated with the defendant here on trial." Id.

Accordingly, under the standard to be applied and this record, we conclude that it was not an abuse of discretion by the trial judge to deny the motion for a mistrial.[5]

**B**

Maynard also claims that he was denied due process because of prosecutorial misconduct in that the prosecutor developed testimony falsely implying that Maynard had threatened a witness, based on the following exchange with government witness Cheryl Rathbun:

MR. LITCHFIELD:     Are you nervous today?

MS. RATHBUN:     Yes.

---

[5]We do not find persuasive Maynard's reliance on United States v. McDermott, 64 F.3d 1448 (10th Cir. 1995). In that case, we ordered a new trial specifically because the defendant's "Sixth Amendment right to self-representation was violated." Id. at 1457. However we also held that it was error to admit evidence of a threat by McDermott to a witness because its probative value was substantially outweighed by its potential for unfair prejudice. Id. Nevertheless we find McDermott unpersuasive because it does not reveal a record with the other factors present here which do not favor a new trial – a firm curative instruction and questioning of the jury as to its ability to disregard the damaging evidence.

| | |
|---|---|
| MR. LITCHFIELD: | Why? |
| MS. RATHBUN: | I don't know. |
| MR. LITCHFIELD: | Has anybody forced you to testify here today? |
| MS. RATHBUN: | No, sir. |
| MR. LITCHFIELD: | Have you been threatened, ma'am? |
| MS. RATHBUN: | Not to my face. |

II App. at 329 (emphasis added).

Maynard contends that the prosecutor developed this line of questioning although he knew there was no evidence such a threat had been made by Maynard. Indeed, Maynard further argues that testimony developed outside the presence of the jury made it clear that the threat had not come from him. Id. at 322. Ms. Rathbun was asked whether Maynard had a "hit out on" her. She answered: "Not that Jimmy [Maynard] did, but the hit was coming from the Maynards, from being up here to testify for Maynard, not that he directly done it." Id. at 332.

Maynard made a motion for a mistrial, but it was overruled by the judge. Although Maynard contends that a request for a curative instruction was denied, the record indicates that after a bench conference on this matter, the trial judge gave the jury the following instruction:

> Ladies and gentlemen, I instruct you to disregard the statement made, the last statement made by the witness concerning why she might be nervous. I instruct you to disregard that entirely. You may continue.

Id. at 335.

In light of this curative instruction, we conclude that the judge did not abuse his discretion in his handling of this incident which does not require a new trial.

<strong>C</strong>

Maynard next argues that the prosecutor developed testimony which falsely implied that another witness, Donna Gatwood, was not registered under her own name in a motel because she felt threatened by Maynard. In his examination of Ms. Gatwood, the prosecutor brought out the fact that Ms. Gatwood was staying at a motel. He then asked: "Ms. Gatwood, you are not on the register of that motel, are you?. . ." Ms. Gatwood answered: "No, sir." III App. at 503. Maynard objected on the ground that it was "highly prejudicial" to "imply that she is being protected from Mr. Maynard, Maynard made threats, or she is afraid. . . ." Id. at 504.

The trial judge was troubled by the fact that the prosecutor's questioning suggested that a "security" reason lay behind the witness's name not appearing on the motel register. The judge, however, noted that he did not think defense counsel wanted any more questions to be asked of the witness, to which defense counsel replied: "It's so broad." Id. at 507. The prosecutor then stated that the subject was a "quagmire." Id. The judge then told counsel: "Just drop it, but do not ask any more questions that have that implication [that a witness felt insecure and needed concealment of her name]. It is

inappropriate evidence in the case." Id. The subject was dropped by counsel.

From our examination of the record, we conclude that no reversible error is apparent in the actions taken by the judge with respect to this matter.

**D**

Lastly, Maynard argues he was denied a fair trial because of a statement by government witness Carol Ann Watts, who testified that Maynard had been in jail. The prosecutor asked Ms. Watts whether Maynard had ever talked with her about a time when his car had been stopped. There was an objection by defense counsel as to leading the witness with a suggestive question. That objection was overruled and the witness said: "That was when he had got stopped and went to jail." I App. at 125.

There is no showing in the record that the government intentionally sought to interject the statement about the "jail," and the event was not prominent in the trial. There was no contemporaneous objection made to this statement about the traffic stop and Maynard's going to jail thereafter. Examination of the record fails to show any prejudicial error from the incident.

In sum, we conclude that the incidents complained of do not demonstrate reversible error, either singly or cumulatively. As noted earlier, the incident about the young man's being sent to California, Maynard's statement that he wanted him dead, and then a later question and answer showing that the young man was in fact dead, raise substantial

concerns.  Nevertheless, the incidents were handled carefully by the trial judge, and this incident and the others discussed above do not demonstrate reversible error or an abuse of discretion by the trial judge in denying the mistrial motions.

In concluding this analysis, we are moved to recall these instructive comments by the Supreme Court:

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. . . . [The prosecutor] may prosecute with earnestness and vigor – indeed, he should do so.  But, while he may strike hard blows, he is not at liberty to strike foul ones.  It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

Berger v. United States, 295 U.S. 78, 88 (1935); see also Gabaldon, 91 F.3d at 94-95.


## II

## SUFFICIENCY OF THE EVIDENCE

Maynard next challenges the sufficiency of the evidence to support his conviction under 21 U.S.C. § 848.  Maynard stresses his argument that the prosecution failed to prove beyond a reasonable doubt that he derived "substantial income or resources" from his drug dealing, as required by 21 U.S.C. § 848 (c)(2)(B).  Opening Brief of Appellant at 1, 15.  We review the evidence in the light most favorable to the government to determine whether "any rational trier of fact could have found the essential elements of the crime

- 15 -

beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original).

The record does not support the defendant's position. Title 21 U.S.C. § 848 (c) defines a continuing criminal enterprise (CCE):

> [A] person is engaged in a continuing criminal enterprise if–
>
> (1) he violates any provision of this subchapter or subchapter II of this chapter the punishment for which is a felony, and
> (2) such violation is a part of a continuing series of violations of this subchapter or subchapter II of this chapter–
>> (A) which are undertaken by such person in concert with five or more other persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management, and
>> (B) from which such person obtains substantial income or resources.

Thus, a CCE conviction must be supported, inter alia, by proof that the defendant obtained "substantial income or resources" from trafficking in narcotics. 21 U.S.C. § 848 (c)(2)(B). A precise definition has not been developed as to "substantial income or resources," and the practical meaning of the term is normally a question for the trier of fact. However, the government "need not prove a definite amount of net profit -- it is sufficient to show substantial gross receipts, gross income or gross expenditures for resources." United States v. Dickey, 736 F.2d 571, 588 (10th Cir. 1984); see also United States v. Hahn, 17 F.3d 502, 507 (1st Cir. 1994) ("The government need only prove revenue, not profit."); United States v. Church, 955 F.2d 688, 697 (11th Cir. 1992) (holding that the government "need only prove revenue, not profit").

Our review of the record leads us to conclude that the prosecution satisfied its burden. Testimony of government witness Carol Watts covered a conversation in 1991 when a Roy Rogers called and talked with Maynard. I App. at 131. She heard Maynard's part of the conversation. He talked about how to go to California and bring back quantities of methamphetamine. Maynard mentioned the cost involved as being $20,000. Id. at 132.

There was also government testimony from a witness, Phyllis Christine Henson, who testified she bought methamphetamine from Maynard and paid him about $1,200 per ounce. Id. at 250. Moreover, Ms. Henson testified she would buy drugs from a man named Randy in California. II App. at 251-52. Henson was to bring back two and a quarter pounds of drugs, and Maynard gave her the cash for the drugs. This took place in about January of 1992. Id. at 252-53. Henson took a plane to California. Maynard gave her expense money usually of $1,000. Maynard gave Henson a beeper number to call Randy. Id. at 253. Henson believed she flew three times and brought two and a quarter pounds each time. Each pound cost an amount that Henson said she would average at about $10,000. Id. at 255. Ms. Henson also testified that Maynard gave her money to pay Randy. II App. at 256. Henson recalled three flights, about three car trips, and about three train trips on which she brought methamphetamine back from California, about two and a quarter pounds each time. Id. at 265. Ms. Henson testified that as to money for those trips, "[s]ome of those were from Jimmy." Id. at 265. She gave the money to

Randy, approximately $21,000 on each trip. Id. Some trips Henson made to California were for herself, not all were for Maynard. Id. at 269.

Witness Glen Bartley also testified as a government witness. II App. at 278. Bartley testified that Dolind Ward, also known as Randy Ward, was a source of methamphetamine. Id. at 283-84. Twice Bartley got four pounds of methamphetamine. Id. at 284. Before the first trip he got $8,000 from Maynard and he believed two pounds of the drug was for Maynard. Both trips were to recover some methamphetamine for Maynard. On the second trip to California Maynard gave Bartley $11,000 and Bartley brought back one pound of the drug for Maynard. Id. at 285-86. The remaining three pounds of the drug were sold by Bartley. Id. at 286. Bartley got $4,000 from Maynard for the drug delivered to Maynard. Id. at 287. Similarly, witness Patterson testified that Maynard gave him over $4,000 to obtain glassware and chemicals. Id. at 375. Moreover, Officer Jackson testified that based on his training and experience with methamphetamine organizations he believed that Maynard was the head of this organization. III App. at 648-49.

Accordingly, we conclude that there was ample evidence presented at trial to sustain the government's burden of proving beyond a reasonable doubt that Maynard obtained substantial income or resources from his drug trafficking. Hahn, 17 F.3d at 507 ("The 'substantial income' requirement may be met either by direct evidence of the revenues realized and resources accumulated by the defendant, or by such circumstantial evidence

as the defendant's position in the criminal organization and the volume of drugs handled by the organization."); <u>United States v. Medina</u>, 941 F.2d 1247, 1252 (9th Cir. 1991) (holding evidence of $50,000 income from drug deals during three-month period and circumstantial evidence that drug dealing was defendant's full time occupation is sufficient to establish "substantial income or resources"); <u>United States v. Jones</u>, 801 F.2d 304, 310 (8th Cir. 1986) (rejecting suggestion that the CCE statute was intended only to reach "Mafia-type Godfathers" and not "Arkansas residents living in rented houses and riding old motorcycles").

### III

### **CONCLUSION**

In sum, the evidence in this record appears sufficient to support findings, beyond a reasonable doubt, for a conviction on Count One. It showed continuing violations of the drug laws by the methamphetamine operation; that Defendant Jimmy Lee Maynard was an organizer and supervisor in managing the drug operation; and that Defendant Maynard obtained substantial resources or income from the drug operation, all in violation of 21 U.S.C. § 848 (a), (c) and (d). There was no reversible error in the conduct of the trial with respect to the serious prosecutorial misconduct we have considered. Accordingly, we AFFIRM the judgment of the district court.