**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**February 21, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

JORGE TORRES-LARANEGA,

      Defendant-Appellant.

No. 05-2302

**Appeal from the United States District Court
for the District of New Mexico
(D.C. No. CR-03-2112 MV)**

Scott M. Davidson, Albuquerque, New Mexico, for Defendant-Appellant.

Kenneth J. Gonzales, Assistant United States Attorney (David C. Iglesias, United States Attorney, with him on the brief), Albuquerque, New Mexico, for Plaintiff-Appellee.

Before **BRISCOE**, **McCONNELL**, and **GORSUCH**, Circuit Judges.

**GORSUCH**, Circuit Judge.

Jorge Torres-Laranega was the leader of a rather brazen drug-trafficking ring that transported multi-ton quantities of marijuana in tractor trailers from the southwestern United States to the Chicago area. Despite four government seizures of Mr. Torres-Laranega's tractor trailers in a four month period (the

result of a federal informant working within his operation), Mr. Torres-Laranega was actively planning yet another drug shipment when the government arrested him and his confederates. Following a jury trial, Mr. Torres-Laranega was convicted for engaging in a continuing criminal enterprise ("CCE") under the "drug kingpin" statute, as well as for possession with intent to distribute 1,000 kilograms or more of marijuana. *See* 21 U.S.C. §§ 848(a), 841(a)(1) and 841(b)(1)(A).

Mr. Torres-Laranega raises only two issues on appeal, both seeking reversal of his CCE conviction. First, he asserts that the district court's jury instructions improperly lowered the government's burden of proof on the "substantial income" element of the CCE charge. Second, he contends insufficient evidence exists to suggest that he personally obtained substantial income or resources from the enterprise. For reasons discussed below, we disagree and thus affirm the district court's judgment.

I

This case began on April 7, 2003, when law enforcement detained Yolanda Alarcon, a commercial truck driver, on her way from El Paso, Texas, to Las Cruces, New Mexico, suspecting that her truck had recently been involved in transporting a load of marijuana. Trial Tr. 373-75. In the course of that encounter, Ms. Alarcon admitted that she was involved in a significant drug-trafficking operation and she eventually offered to serve as a paid government

informant.  An eight-month investigation leading to the eventual arrest of 14 individuals followed.[1]

*The Enterprise*

From 2001 until June 2002, Ms. Alarcon worked legitimately as a licensed truck driver.  During June 2002, she first met Mr. Torres-Laranega, the enterprise's ringleader and a wealthy man who owned two significant homes, a plethora of luxury vehicles, and yet who, authorities later learned, filed no tax returns for 2001, 2002 or 2003.  Trial Tr. 656, 1655-58.  Aware of his line of work, Ms. Alarcon asked a friend to introduce her to Mr. Torres-Laranega in the hope of being offered a job transporting narcotics because she thought it would be "good, easy money."  *Id.* at 661.  Mr. Torres-Laranega proved receptive and stated that he would pay Ms. Alarcon $13,000 - $20,000 for every successful tractor trailer load of narcotics delivered from the southwestern United States to the Chicago area.  *Id.* at 662.  That very day, Ms. Alarcon agreed to drive a tractor trailer for Mr. Torres-Laranega from El Paso to Las Cruces in return for $800.  *Id.* at 663-67.

---

[1]  Beyond the facts recited here, our decisions on the appeals of two of Mr. Torres-Laranega's confederates contain additional details about the enterprise. *See United States v. Mendivil*, No. 05-2271, 2006 WL 3598301 (10th Cir. Dec. 12, 2006) (unpub.); *United States v. Diaz*, No. 05-2348, 2007 WL 10752 (10th Cir. Jan. 3, 2007) (unpub.).

A few months later, in August or September of 2002, Mr. Torres-Laranega asked Ms. Alarcon to transport a tractor trailer that he owned from El Paso to a ranch house in Las Cruces (the "ranch house"). *Id.* at 670-72. At the ranch house, Mr. Torres-Laranega and his associates loaded the truck with drugs. *Id.* at 676-77. At Mr. Torres-Laranega's instruction, Ms. Alarcon then moved the truck from the ranch house to a truck stop also in Las Cruces. *Id.* at 677. A confederate told Ms. Alarcon that the loaded truck was thereafter driven from Las Cruces to Chicago, and there is no indication that this tractor trailer, and the load of drugs it held, failed to reach its intended destination. *Id.* at 680.

Around March of 2003, Ms. Alarcon was asked to assist Mr. Torres-Laranega's operation with another drug run, this time starting at a stash house on Parker Road in Las Cruces (the "Parker stash house"). The Parker stash house, for which Mr. Torres-Laranega paid the rent, served as a staging point for marijuana originating in Juarez, Mexico. *Id.* at 680-90. Cars from Juarez would deliver drugs to the Parker stash house; then, inside the house, conspirators would package the marijuana into bundles and load them into tractor trailers headed for Chicago. *Id.* at 687-88. In mid-March of 2003, Ms. Alarcon personally observed a trailer she had previously driven being loaded with bundles at the Parker stash house. *Id.* at 689. Within a couple of days, Ms. Alarcon's son Memo, an active participant in the enterprise, told her that he and Mr. Torres-Laranega took this very truck to Chicago. *Id.* at 695-96. Memo remained in Chicago with Mr.

- 4 -

Torres-Laranega for a week. *Id.* Again, there is no indication that any of the drugs transported were seized by authorities.

Ms. Alarcon was hardly the only driver employed by Mr. Torres-Laranega. Juan Antonio Barraza explained to Ms. Alarcon in July 2003 that he and his brother had recently driven a load of marijuana from El Paso to Chicago, and that Mr. Torres-Laranega paid Mr. Barraza and his brother $7,000 for the trip. *Id.* at 765-77; 772-73. Evidence obtained by law enforcement corroborates this trip and suggests it occurred in early July of 2003. *See id.* at 2283-87; Ex. 187 (fictitious bill of lading used that trip); Ex. 741 at 11-20 (conversations with Mr. Torres-Laranega and others discussing a traffic citation received by Mr. Barraza during the trip); Ex. 952 (traffic citation for Mr. Barraza dated July 3, 2003).

In early April 2003, Mr. Torres-Laranega asked Ms. Alarcon to move yet another truck from El Paso to the ranch house in Las Cruces. Trial Tr. 698-701. Mr. Torres-Laranega paid Ms. Alarcon $1000 for this drive. *Id.* at 701. The route, however, required Ms. Alarcon to pass through a Department of Transportation ("DOT") inspection station just outside of Las Cruces. *Id.* at 703. During a routine stop, the DOT officer noticed that the bill of lading Ms. Alarcon presented suggested she was carrying 18 washers when he observed only 16 washer-sized boxes in the trailer. *Id.* at 707. His suspicions were confirmed when he accidentally fell on top of a box and discovered it was empty – there was no washer within. *Id.* While there were no narcotics in the trailer at that time, a

law enforcement narcotics detection dog alerted officers that there had recently been narcotics in the trailer. *Id.* at 353-54, 710. The DOT officer then brought Ms. Alarcon in for questioning and detained her for several hours. *Id.* at 710.

Ms. Alarcon eventually told the officers about Mr. Torres-Laranega's operation and her involvement in the transportation of narcotics because she "wasn't going to lose [her] six-year-old son, for – that." *Id.* at 710-11. Subsequently, Ms. Alarcon agreed to serve as a paid confidential informant. *Id.* at 711, 2375-76. Unbeknownst to Mr. Torres-Laranega, from that point on, all of Ms. Alarcon's dealings with him were under the watch of the Federal Bureau of Investigation ("FBI"). *Id.* at 2361-62.

*The Seizures and Arrest*

On May 18, 2003, Ms. Alarcon informed Agent Andrew Armijo of the FBI that one of Mr. Torres-Laranega's henchmen, Edgar Lopez-Hernandez, asked her to move a partially "loaded" purple tractor trailer for himself and Mr. Torres-Laranega. *Id.* at 156, 722-28. Specifically, Ms. Alarcon was to move the truck around Las Cruces (from a truck stop to an auto repair shop and then back to the truck stop) in order to complete the truck's load of marijuana before its shipment North. *Id.* at 724-28. At the repair shop, agents observed the rear cargo doors of the trailer open and individuals working around the vehicle. *Id.* at 2363, 2372. Shortly thereafter, another participant in the enterprise, Martin Mendivil, proceeded to take the tractor trailer northbound toward Chicago. At a permanent

U.S. Border Patrol checkpoint on Interstate 25, approximately 20 miles north of Las Cruces, the trailer was searched and 1,417 kilograms of marijuana were seized. *Id.* at 167, 239. Mr. Torres-Laranega subsequently paid for an attorney to represent Mr. Mendivil in connection with charges arising from the seizure. Ex. 296 at 3-4.

In early July of 2003, Ms. Alarcon informed Agent Armijo that Mr. Torres-Laranega asked her to drive another tractor trailer from Chicago to Laredo, Texas, so that it could be packed with marijuana for a return trip to Chicago. Trial Tr. 753. Mr. Torres-Laranega told Ms. Alarcon that he "give[s] all the people around 20," Ex. 166f, and would pay her $15,000 to $20,000 to drive the load depending upon whether it was a "good load." *Id.* at 755; Ex. 166f at 2. Mr. Torres-Laranega subsequently gave Ms. Alarcon $700 to fly from El Paso to Chicago on July 10, 2003, Trial Tr. 741-42, and another $100 to treat herself and two confederates to dinner in Chicago, *id.* at 769-70. Prior to beginning the drive to Texas, Mr. Torres-Laranega gave Ms. Alarcon an additional $600 to cover incidental travel expenses. *Id.* at 777-78.

After Ms. Alarcon completed her portion of the drive, Jose Barraza manned the truck for the return trip from Texas to Chicago. When the truck stopped for gas in Indiana, a police officer with the Chicago Police Department approached Mr. Barraza and requested, and received, permission to search the trailer. *Id.* at 1397-99. During the search, the officer uncovered and seized 681 kilograms of

marijuana. *Id*. at 1407-08. On Mr. Torres-Laranega's bidding and at his expense, Mr. Barraza flew from El Paso to Chicago in an attempt to retrieve the truck for Mr. Torres-Laranega. *See* Ex. 243. In a recorded conversation between Mr. Barraza and Mr. Torres-Laranega, Mr. Barraza makes reference to the fact that Mr. Torres-Laranega "bought the [seized] trailer." Ex. 285 at 2-3.

Undeterred by the government's two seizures (so far), Mr. Torres-Laranega instructed Ms. Alarcon to register yet another tractor trailer, this time a grey Freightliner which Mr. Torres-Laranega owned, under Ms. Alarcon's name. Trial Tr. 835-36. Ms. Alarcon paid the registration fees with $500 that Mr. Torres-Laranega gave her for that purpose. *Id*. at 826-27. On July 17, 2003, Ms. Alarcon accompanied Mr. Torres-Laranega to his home in El Paso where he retrieved at least $8,000 in cash to pay for a refrigerated trailer to attach to the grey Freightliner. *Id*. at 837-39. She observed that the home was gated with a long driveway and an indoor swimming pool. *Id*. at 838.

Subsequently, Ms. Alarcon and Mr. Torres-Laranega met Joe Diaz, a member of the operation who regularly supplied tractor trailers to the enterprise, in order to repair the refrigerated trailer purchased for the grey Freightliner. *Id*. at 866-68. On August 6, 2003, a New Mexico Police Officer photographed Mr. Diaz and Mr. Torres-Laranega attempting to jump start the grey Freightliner. *Id*. at 1990-92, 1995-97. On that same day, two phone calls were intercepted between various members of the enterprise discussing delivery and unloading at a

house in El Paso.  Ex. 381; 388.  In one call, Mr. Torres-Laranega discussed the value and weight of the marijuana with Raul Espinoza.  *See* Ex. 734 (Mr. Torres-Laranega inquired, "How much is it going to be?" Mr. Espinoza replied, "it's eight hundred, it's alright? Is it not?" to which Mr. Torres-Laranega responded "Of course it is damn it! That's a trip! Huh?").

The following day, August 7, 2003, in a conversation again between Mr. Torres-Laranega and Mr. Espinoza, Mr. Torres-Laranega asked Mr. Espinoza to tell a man that "we leave today, that we are unable to leave yesterday because . . . well, for small issues."  Ex. 445 at 2.  Later that day, 523 kilograms of marijuana were seized by law enforcement in a house in El Paso.  Trial Tr. 1912-19; Ex. 951.  One of the individuals detained while fleeing the residence was Mr. Espinoza.  Trial Tr. 1769-70.

A month later, on September 9, 2003, Mr. Torres-Laranega instructed Ms. Alarcon to drive the grey Freightliner from Las Cruces to El Paso to pick up drugs for another journey to Chicago.  *Id*. at 878-81.  The following day, Ms. Alarcon did just that.  *Id*. at 883; *see also id*. at 2011.  Upon arriving at a Love's Truck Stop in El Paso, Ms. Alarcon was met by two of her colleagues in the trafficking ring.  *Id*. at 883-84.  Following Mr. Torres-Laranega's direction that Mr. Diaz would coordinate travel arrangements for Ms. Alarcon and her companions in and around El Paso, the three of them left the truck stop together in Mr. Diaz's personal truck.  Ex. 510.  Subsequently, FBI agents observed

another member of the conspiracy drive the grey Freightliner to a warehouse in El Paso and back it into a loading dock.  Trial Tr. 1970-71.

That same day, September 10, 2003, in a recorded conversation, Mr. Diaz asked another member of the operation, Cesar Miramontes, about the location of the grey Freightliner and its security.  Mr. Diaz also inquired in code whether the drugs had been loaded – to which Mr. Miramontes responded, "UPS has stopped . . . by there to deliver and all that."  Ex. 507 at 3.  Two days later, the grey Freightliner was searched by the authorities in El Paso at the location given by Mr. Miramontes in his call with Mr. Diaz.  *See* Trial Tr. 2017.  During the search, Mr. Torres-Laranega telephoned Ms. Alarcon and told her about the investigation.  Ex. 582.  He instructed her not to answer the phone when the police called, but that, if questioned, she should fabricate a story.  Ex. 582; 583.  He suggested she tell the police that she gave her truck keys to a "Jose Lopez" in order to detail the truck.  Mr. Torres-Laranega subsequently created business cards for an auto detailer named "Jose Lopez" and a fictitious receipt for such work, and gave both to Ms. Alarcon.  Trial Tr. 900-04.

Mr. Torres-Laranega was also in constant telephone communication during the police search with Gabriel Fernandez, yet another member of the ring, who relayed a minute-by-minute accounting of the investigation of the truck.  Ex. 580; 582.  During a recorded conversation, Mr. Torres-Laranega promised Mr. Fernandez and another person a bonus of $20,000 each "if nothing happens and

- 10 -

everything turns out all right." Ex. 581. As it happened, however, a total of 2,340 kilograms of marijuana were found and seized by authorities. Ex. 951.

Remarkably, even after this fourth seizure, Mr. Torres-Laranega was apparently not aware of the government's investigation and instructed Ms. Alarcon to register and insure another tractor trailer in her name to transport narcotics. Trial Tr. at 920-21. He also provided Ms. Alarcon with $1,000 to hire an attorney in an effort to retrieve the grey Freightliner seized by federal authorities so that it could be used in future drug runs. *Id*. at 907, 2469. Ms. Alarcon delivered the documents relating to the seized Freightliner to Mr. Torres-Laranega's gated home in Juarez, Mexico. *Id*. at 909-10. The gated home was known as "La Fuente" because it had a "big water fountain" in front. *Id*. at 910-11.

Authorities finally arrested Mr. Torres-Laranega and five of his co-conspirators on November 19, 2003. Simultaneously, the FBI conducted a search of Mr. Torres-Laranega's residence in El Paso and discovered several documents relating to the operation, including: (1) documents regarding Stallion Transportation (a fictitious trucking company established by Mr. Diaz) which leased two of the tractor trailers seized by authorities; (2) a traffic citation for another confederate; and (3) a lease agreement for one of the seized tractor trailers. *Id*. at 2234-45. Mr. Torres-Laranega was subsequently charged with CCE, conspiracy to possess with intent to distribute a controlled substance, and

possession with intent to distribute 1,000 kilograms or more of marijuana.  On

February 23, 2005, after a month long trial, the jury returned a verdict of guilty

on all counts.[2]  Mr. Torres-Laranega was sentenced to 240 months in prison, the

statutory minimum for a CCE conviction.  *See* 21 U.S.C. § 848(a).  Our

jurisdiction arises under 28 U.S.C. § 1291.[3]

## II

On appeal, Mr. Torres-Laranega asserts that the district court improperly

instructed the jury with respect to the "substantial income or resources" element

of the CCE offense.  Under 21 U.S.C. § 848(c), a person is subject to conviction

for engaging in a continuing criminal enterprise if:

> (1) he violates any provision of [the federal drug laws] the
> punishment for which is a felony, and
>
> (2) such violation is a part of a continuing series of violations of [the
> federal drug laws] –
>
> > (A) which are undertaken by such person in concert with
> > five or more other persons with respect to whom such
> > person occupies a position of organizer, a supervisory
> > position, or any other position of management, and

---

[2]  The district court subsequently vacated the jury's verdict on the conspiracy count on the ground that it is a lesser included offense of a CCE conviction.

[3]  The district court also sentenced Mr. Torres-Laranega to 120 months for his possession with intent to distribute conviction, but ordered this sentence to run concurrently with his CCE sentence.  Finally, the court ordered Mr. Torres-Laranega to a term of 10 years of unsupervised release following completion of his sentence, and to pay a $200 assessment.

(B) from which such person obtains substantial income or resources.

Because Mr. Torres-Laranega failed to object to the district court's CCE jury instruction and did not proffer a competing instruction of his own, we will disturb the district court's judgment only if its instructions were infected by plain error; that is, Mr. Torres-Laranega must show that the district court not only committed error, but that such error was plainly evident; that it affected his substantial rights; and that it seriously affected the fairness, integrity, or public reputation of the judicial proceedings. *United States v. Burbage*, 365 F.3d 1174, 1180 (10th Cir. 2004).

Mr. Torres-Laranega contends he meets this high standard for two reasons meriting mention here. First, he argues that the jury was allowed to find the substantial income element without proof that Mr. Torres-Laranega personally – as opposed to the drug running operation generally – obtained the requisite substantial income or resources. Appellant's Br. 29. As it happens, however, the district court specifically and expressly instructed that the question before the jury was whether the defendant – that is, Mr. Torres-Laranega himself – obtained substantial income or resources. *See* Jury Instruction No. 18 (the jury must find beyond a reasonable doubt that "*the defendant* obtained substantial income or resources from the series of violations . . . [t]he government may meet the substantial income requirement . . . by direct evidence of the revenues realized

and resources accumulated *by the defendant*" (emphases added)).  No more is required.

Second, and more substantially, Mr. Torres-Laranega charges that the district court improperly fused the substantial income or resources element of Section 848(c)(2)(B) with the separate managerial element of Section 848(c)(2)(A), effectively subsuming the former into the latter.  Appellant's Br. 26.  With respect to the managerial element of Section (c)(2)(A), the district court instructed that the jury had to find that

> the defendant undertook [the series of violations of the federal drug laws] in concert with five or more other persons with respect to whom the defendant occupied a position of organizer, supervisor, or manager . . . The term "organizer, supervisor, or manager" means that the defendant was more than a fellow worker and that the defendant either organized or directed the activities of five or more other persons, exercising some form of managerial authority over them.  The defendant need not be the only organizer or supervisor, and the "five or more persons" may include persons who are indirectly subordinate to the defendant through an intermediary . . . there is no requirement for you to find the defendant was the dominant organizer, supervisor, or manager of the enterprise.

Jury Instruction No. 18.  With respect to the substantial income or resources element of Section (c)(2)(B), the court instructed that

> [t]he term "substantial income or resources" means income in money or property which is significant in size or amount as distinguished from some relatively insignificant, insubstantial, or trivial amount.  The government need not prove a definite amount of net profit – it is sufficient to show substantial gross receipts, gross income, or gross expenditures for resources.  The government may meet the substantial income requirement either by direct evidence of the revenues realized and resources accumulated by the defendant, *or by such*

*circumstantial evidence as the defendant's position in the criminal organization and the volume of drugs handled by the organization.*

Jury Instruction No. 18 (emphasis added); *see also* Trial Tr. 2727-29. We understand Mr. Torres-Laranega as essentially contesting the italicized portion of the latter instruction, suggesting that by allowing the jury to find substantial income or resources from his position in the criminal organization in conjunction with the volume of drugs handled by the organization, the court improperly conflated two separate and distinct elements of the government's proof.

We disagree. We begin by noting that, although the defendant challenges a clause in one instruction, in reviewing an alleged error we are required to review and assess the district court's jury instructions as a whole without undue emphasis on any particular clause. *See United States v. Park*, 421 U.S. 658, 674-75 (1975); *United States v. McConnel*, 464 F.3d 1152, 1158 (10th Cir. 2006). In this case, the jury instructions viewed as a whole tracked and recited each of the applicable statutory elements for a CCE conviction; further, they clearly and correctly stated the applicable legal standard under Section (c)(2)(B) – namely that "[t]he term 'substantial income or resources' means income in money or property which is significant in size or amount as distinguished from some relatively insignificant, insubstantial, or trivial amount." Jury Instruction No. 18.

Even if one could properly examine the italicized clause of which the defendant complains in isolation, the district court's instruction did *not* allow the

jury to infer that Mr. Torres-Laranega obtained substantial resources simply by virtue of his position within the drug-trafficking organization. Before being permitted to draw an inference that Mr. Torres-Laranega obtained substantial resources, the district court required the jury to consider *both* the defendant's position within the organization *and* the volume of drugs handled by the organization.[4] This latter requisite is independent and additive to anything required under Section (c)(2)(A). It is also directly drawn from language contained in a First Circuit decision, *United States v. Hahn*, 17 F.3d 502, 507 (1st Cir. 1994), which was, in *dicta*, quoted by this Court in *United States v. Maynard*, 236 F.3d 601, 610 (10th Cir. 2000).

The district court's instruction, moreover, makes good sense of the statutory language. Section (c)(2)(B) requires the jury to find that the defendant

---

[4] To the extent that Mr. Torres-Laranega might be understood to suggest that the challenged phrase in Jury Instruction No. 18 permitted the jury to find the substantial income element by evidence *either* of the defendant's position in the organization *or* the volume of drugs handled by the organization, he does so for the first time on appeal; having failed to present this issue to the district court in the first instance, under our precedents Mr. Torres-Laranega must establish that the district court did not merely err but committed plain error here as well. *See United States v. Shaffer*, 472 F.3d 1219, 1227 (10th Cir. 2007). This Mr. Torres-Laranega cannot do. His argument depends on a misconstruction of the instruction; the clause at issue contains the conjunctive "and" – not a disjunctive "or" – thereby clearly informing the jury that sufficient proof of *both* the defendant's position *and* the volume of drugs handled by the organization was required. We are obliged as a matter of law to presume that the jury understood and followed the district court's direction on this score. *See United States v. Almaraz*, 306 F.3d 1031, 1037 (10th Cir. 2002).

"obtain[ed] substantial income or resources," but does not command the government to rely solely on direct evidence and does not otherwise define the term. Here, as in virtually all matters at trial, the district court merely emphasized that the government could prove its case by indirect or circumstantial evidence and with reference to jurors' common sense.[5] Specifically, the district court's challenged language permitted the government to prove its case based on two inferences: first, that an organization that deals drugs in large volumes is likely to have "substantial" income or resources to bestow on its participants, and, second, that a person who holds a high-level position within such an organization likely obtains a significant share of the organization's income or resources. Both of these propositions seem to us entirely faithful to the statutory language and common sense. Using the district court's reasoning in another setting, one might infer from, say, the volume of business done by the Trump conglomerate, and Donald Trump's position as the head of those eponymous businesses, that Mr. Trump himself obtains "substantial income or resources" from the enterprise.

---

[5] *See United States v. Hutching*, 75 F.3d 1453, 1458 (10th Cir. 1996) (this Court will consider circumstantial evidence in determining if the government has presented sufficient evidence supporting the defendant's CCE conviction); *Welch v. City of Pratt, Kan.*, 214 F.3d 1219, 1224 (10th Cir. 2000) (jurors can use evidence presented at trial along with their "common sense and experience to draw sufficient inferences"); *see also* Jury Instruction No. 6 ("[Y]ou may make deductions and reach conclusions that reason and common sense lead you to draw from the facts which have been established by the evidence.").

Direct proof it may not be, but a permissible and common sense inference it surely is.

To reject the district court's instruction would, we think, also serve to undercut the very purpose of the statute. In order to be successful, and thus avoid detection, drug traffickers must camouflage all aspects of their businesses. The ever evolving "arms race" between drug-trafficking enterprises and law enforcement inspires and demands drug traffickers to become more sophisticated in disguising not only their trafficking activity but also the resulting income. Aware of this, Congress deliberately chose to leave the term "substantial income or resources" undefined and it is presumed to be aware of the law's background norm that, in such circumstances, the phrase will be read by jurors and courts alike in accord with common sense inferences from daily life. *See F.T.C. v. Kuykendall*, 466 F.3d 1149, 1154 (10th Cir. 2006) ("The starting point in interpreting a statute must be the language employed by Congress, and we assume that the legislative purpose is expressed by the ordinary meaning of the words used." (quotation omitted)). To require the government to proceed against drug traffickers only when they can prove receipt of substantial income or resources by means of more direct proof would be to disregard this principle.[6]

_____

[6] Mr. Torres-Laranega briefly argues that the substantial income element of the offense is not clearly defined and thus the statute should be held void for vagueness. Appellant's Br. 28. We have previously considered and rejected this

(continued...)

We find it noteworthy, too, that we are far from alone in reaching the

conclusion we do today. Circuit courts across the country faced with this issue

have ruled as we do, and we have been cited to no contrary authority. *See Hahn*,

17 F.3d at 507 (holding that the substantial income element may be met by

"circumstantial evidence [of] the defendant's position in the criminal organization

and the volume of drugs handled by the organization"); *United States v. Church*,

955 F.2d 688, 697 (11th Cir. 1992) (evidence that "the organization reaped

approximately $140,000 [permitted the jury to] reasonably conclude that the

supervisors and managers of such a lucrative operation derived income from it")

(quotation omitted).[7]

---

[6](...continued)
line of argument, and we are bound by that result. *See United States v. Dickey*, 736 F.2d 571, 588 n.7 (10th Cir. 1984) (the term "substantial income," read in its statutory context, does not "fail to adequately warn an individual of the criminal consequences of his action").

[7] *See also United States v. Zavala*, 839 F.2d 523, 527 (9th Cir. 1988) (holding that the large quantity of cocaine trafficked by the appellant's enterprise with a selling price of over $63,000 per kilogram provided sufficient evidence to infer that "the appellant earned substantial income from the enterprise"); *United States v. Chagra*, 669 F.2d 241, 257 (5th Cir. 1982) (defendant's attainment through the enterprise of several kilograms of cocaine and a large quantity of marijuana, which would have brought "a handsome return" if not seized, would alone have been sufficient to prove the substantial income or resources element), `overruled on other grounds*, *Garrett v. United States*, 471 U.S. 773 (1985); *United States v. Kirk*, 534 F.2d 1262, 1278 (8th Cir. 1976) (holding that evidence of the defendant's role "as the leader of a large and active narcotics distribution conspiracy" which distributed "large quantities of heroin and dealt with sufficient money to be able to send agents to New York and California to buy heroin" sufficient to permit the jury to find defendant obtained substantial income or

(continued...)

Even if the jury was properly charged, Mr. Torres-Laranega argues there is insufficient evidence in this record to show that he "obtain[ed] substantial income or resources" from a "continuing series of violations." *See* 21 U.S.C. § 848(c) (reprinted above). We, of course, review such challenges *de novo*, but, out of respect for the jury's verdict and the district court's judgment, in doing so we are required to review the facts in the record in the light most favorable to the prevailing party, here the government. *See Almaraz*, 306 F.3d at 1040.

At the outset, we ask what is the relevant "continuing series of violations" subject to our review. The Supreme Court has instructed that the government need not prove that a CCE defendant obtained substantial income or resources from *each* violation that comprises the relevant series; rather, we are told, the jury need find only that the defendant obtained substantial income or resources from the series of violations viewed as a whole. *See United States v. Richardson*, 526 U.S. 813, 823 (1999). The Court in *Richardson* did leave open, however, the question whether jury unanimity is required on which acts constitute "violations"

_____

[7](...continued)
resources from the operation) *vacated in part on other grounds*, 723 F.2d 1739 (1983); *United States v. Sisca*, 503 F.2d 1337, 1345-46 (2d Cir. 1974) (jury could infer the defendant received substantial income or resources where the defendant was the "operational kingpin" of a narcotics distribution network trafficking an "enormous quantity of narcotics" and "substantial sums of money" changed hands).

forming the requisite series for purposes of the substantial income or resources and managerial control elements. *Id.* at 823-24. In *Almaraz*, we held that the jury is not limited to considering as violations making up the requisite "continuing series" only those acts for which it returns a unanimous guilty verdict. *See* 306 F.3d at 1037-39. Bound though as we are by these holdings, at least one further question does remain unresolved: whether each of the violations constituting the "continuing series" must be separately and specifically alleged in the indictment. *See id.* at 1039-1040. But, as in *Almaraz*, we believe the resolution of this particular question can be left for another day. *Id.* In the case before us, the indictment specifically charged that the violations of law constituting the continuing criminal enterprise included:

(i) possession of marijuana with an intent to distribute;

(ii) from June 8, 2002 through November 19, 2003, conspiring to possess marijuana with an intent to distribute; and

(iii) possession with intent to distribute the marijuana found in each of the four tractor trailers seized by the government.

*See* Indictment at 1-2. For purposes of this appeal, we limit our review of the sufficiency of the evidence to these specifically charged violations.[8]

---

[8] To help dispel doubts about which violations the jury considered part of the continuing series, the district court's special verdict form required the jury to find that the government proved beyond a reasonable doubt each element of the CCE charge as "set forth in Instruction No. 18." Verdict at 2. Instruction No. 18, in turn, identified those acts charged in Counts 2 (conspiracy) and 3 (possession)

(continued...)

In doing so, we also bear in mind that, in constructing Section 848(c)(2)(B), Congress did not require proof of the defendant's net income after deductions for expenses and outlays; rather, it instructed us to examine only whether the defendant obtained substantial "income," a word which is ordinarily understood to embrace gross receipts. *See Dickey*, 736 F.2d at 588 ("[I]t is sufficient to show substantial gross receipts, gross income or gross expenditures for resources."); *see also Webster's Third New International Dictionary* 1143 (2002) (income is "the value of goods and services received by an individual in a given period of time").

Likewise, Congress instructed that Section (c)(2)(B) can be satisfied not only with proof of "income" but also "resources," a word that denotes not just monetary receipts but also things in kind. *See Webster's Third New International Dictionary* 1934 (2002) (the definition of resource encompasses "immediate *and possible* sources of revenue[: such as] rich natural" resources (emphasis added)). Thus, the fact that a defendant has not yet realized the monetary value associated with his or her stock-in-trade is immaterial for assessing whether he or she has obtained "substantial . . . resources." Indeed, we do not doubt that any significant

---

[8](...continued) of the indictment as violations of the federal drugs laws which were part of the continuing series. *See* Instruction No. 18 at 1. Thus, as in *Almaraz*, it appears in this case that the district court went beyond what *Richardson* requires and effectively ensured jury unanimity on each "violation" specifically identified in the indictment.

retailer has "substantial resources," if not income, tied up in its stocked merchandise. Who can question that the tons of merchandise sitting on shelves in any Wal-Mart have significant value and are considered by the company, and any Wall Street analyst for that matter, to be substantial resources? So long as a reasonable jury could infer from the proof presented that the defendant's drug stockpile was itself *obtained* through the alleged continuing criminal enterprise – that is, "gain[ed]" or "attain[ed]" through the enterprise, *see Webster's Third New International Dictionary* 1559 (2002) – Section (c)(2)(B) is satisfied whether or not the monetary value of those resources was ever realized. *See United States v. Herrera-Rivera*, 25 F.3d 491, 499 (7th Cir. 1994) ("Money or drugs are both 'resources' within the meaning of the [CCE] statute."); *United States v. Graziano*, 710 F.2d 691, 697-98 (11th Cir. 1983), *cert. denied*, 466 U.S. 937 (1984) (holding that marijuana is a "resource" and that the defendant "obtained" constructive possession of a "substantial" amount of this resource when he arranged for the transportation of 4,800 pounds of marijuana from South Carolina to New York City); *United States v. Henderson*, No. 02-3426, 78 Fed. Appx. 91, 93 (10th Cir. Oct. 15, 2003) (unpub.) (holding that drugs purchased with money from prior drug deals constitute "resources").

Here, the jury had before it ample evidence that Mr. Torres-Laranega obtained substantial income or resources from the conduct charged in the indictment. For example, the jury received evidence of four separate inchoate

transactions in which the government seized almost 5,000 kilograms worth of marijuana from Mr. Torres-Laranega's enterprise. Evidence was also presented to the jury that, pursuant to the conspiracy charged as part of the continuing criminal enterprise, Mr. Torres-Laranega acquired for distribution vast quantities of marijuana through drug couriers traveling into the United States from Mexico. *See supra* at 4. The jury was free to infer that the 5,000 kilograms of drugs seized by the government were obtained by Mr. Torres-Laranega in this manner and, thus, that Mr. Torres-Laranega "obtained," "gained" or "attained" substantial resources through a violation charged in the indictment as part of the continuing criminal enterprise. *See supra* at 23 (collecting cases); *see also United States v. Webster*, 639 F.2d 174, 182 (4th Cir. 1981) (holding that "given the quantity of drugs which were shown to have been moving in and out of [the defendant's] possession, the jury would have been justified in concluding that the defendant had received tens of thousands or even hundreds of thousands of dollars from his drug business").

The jury also received evidence of at least three successful drug runs made by the enterprise during the course of the conspiracy alleged as part of the continuing series of violations. *See supra* at 3-5, 21 n.8. Twice Ms. Alarcon observed large quantities of marijuana depart from Las Cruces bound for Chicago. *Id.* There was also evidence that in early July of 2003, Mr. Barraza and his brother successfully delivered a load of marijuana in a commercial tractor trailer

- 24 -

to Chicago on behalf of Mr. Torres-Laranega. *See supra* at 5. This is more than sufficient as a matter of law; indeed, evidence of substantial income resulting from a single significant successful transaction in a series of violations can, standing alone, satisfy the CCE statute. *See, e.g., United States v. Gonzalez*, 940 F.2d 1413, 1424 (11th Cir. 1991), *cert. denied*, 502 U.S. 1047 (1992).

In addition, Ms. Alarcon testified that the going rate for driving tractor trailers full of marijuana for Mr. Torres-Laranega during the course of the conspiracy was $13,000 - $20,000 per delivery. Mr. Torres-Laranega did in fact pay Ms. Alarcon, Mr. Mendivil, Mr. Barraza and others, thousands of dollars for driving trucks and related transportation expenses. *See supra* at 3-9. Mr. Torres-Laranega further promised bonuses of $20,000 to Mr. Fernandez and another co-conspirator if the police did not seize a tractor trailer full of marijuana. Still further evidence suggested that Mr. Torres-Laranega owned at least two tractor trailers involved in the trafficking. And, of course, Mr. Torres-Laranega paid for the legal bills of Mr. Mendivil when he was arrested while transporting marijuana, as well as the costs associated with efforts to retrieve seized tractor trailers from law enforcement authorities. We have previously held that evidence of such significant expenditures by a defendant in connection with his or her drug operation supplies a sufficient basis for a jury to infer the defendant's receipt of substantial income or resources from a drug enterprise. *See United States v. Rivera*, 837 F.2d 906, 924-25 (10th Cir. 1988) (holding that

evidence solely of defendant's large cash expenditures relating to the drug enterprise – payment to employees transporting drugs and expenditures for large transportation equipment such as aircraft and trucks – sufficient to meet the substantial income or resources element), *vacated in part on other grounds*, 874 F.2d 754 (1989).

Mr. Torres-Laranega responds to this particular point by suggesting that his expenditures "on behalf of the organization" were "business expenses" and thus cannot be used even as circumstantial evidence that he attained substantial income or resources from the enterprise. But, to put things in proper context, we feel compelled to state the obvious: Mr. Torres-Laranega *was* the business. That is, from the evidence adduced at trial, a reasonable juror surely could have concluded that Mr. Torres-Laranega was, in essence, the "business's" owner and primary beneficiary. Further, the "business" did not have the imprimatur of any state or other authority capable of bestowing it with an independent legal existence; whatever assets or income – or expenses – "the business" had or incurred were necessarily those of Mr. Torres-Laranega himself.

Finally, neither Mr. Torres-Laranega nor his wife filed any tax returns for the years 2001, 2002 or 2003. Yet, Mr. Torres-Laranega owned two homes, one with an indoor swimming pool, and various luxury vehicles. Given the volume of drugs under his control, the evidence of prior successful runs, the assets he possessed, the money he expended in aid of the enterprise, and the lack of

evidence of Mr. Torres-Laranega having any legitimate job, the jury very reasonably could have inferred that trafficking drugs was his full time, and rather lucrative, occupation during the period of time encompassed by the conspiracy charged in the indictment. This too suffices to support the jury's verdict under Section (c)(2)(B). *See United States v. Wilson*, 116 F.3d 1066, 1088 (5th Cir. 1997) (holding that the government is not required to present specific amounts earned from the conspiracy; "the jury may infer substantial income from outward evidence of wealth in the absence of other, legitimate sources of income"), *reversed on other grounds*, 161 F.3d 256 (1998) (en banc); *see also United States v. Escobar-De Jesus*, 187 F.3d 148, 174 (1st Cir. 1999) (jury entitled to conclude that defendant obtained substantial income or resources where evidence demonstrated that for a four-year period the defendant made expenditures of over $238,000 for which no income source could be identified; in one year spent $300,000 in cash; and had a net worth of over one million dollars).

∗   ∗   ∗

The district court's judgment is AFFIRMED.