**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 13, 2022**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

     Plaintiff - Appellant,

v.

JOSE FELIPE HERNANDEZ-
CALVILLO,

     Defendant - Appellee.

_____

UNITED STATES OF AMERICA,

     Plaintiff - Appellant,

v.

MAURO PAPALOTZI,

     Defendant - Appellee.
_____

No. 19-3210

No. 19-3211

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 2:16-CR-20097-CM-5/6)**
_____

James I. Pearce, Attorney, Appellate Section, Criminal Division, Department of Justice, Washington, D.C. (Stephen R. McAllister, United States Attorney, and James A. Brown, Assistant United States Attorney, Topeka, Kansas; and Brian C. Rabbitt, Acting Assistant Attorney General, and Robert A. Zink, Acting Deputy Assistant Attorney General, Criminal Division, Department of Justice, Washington, D.C., with him on the briefs), for Plaintiff - Appellant.

Mark C. Fleming of Wilmer Cutler Pickering Hale and Dorr LLP, Boston, Massachusetts (Robert N. Calbi of Law Offices of Robert N. Calbi, Kansas City, Missouri; Daniel T. Hansmeier, Appellate Chief, and Melody Brannon, Federal Public Defender, Kansas Federal Public Defender, Kansas City, Kansas; Eric L. Hawkins and Kevin R. Palmer of Wilmer Cutler Pickering Hale and Dorr LLP, Boston, Massachusetts; and Thomas G. Sprankling of Wilmer Cutler Pickering Hale and Dorr LLP, Palo Alto, California, with him on the brief), for Defendants - Appellees.

_____

Before **MATHESON**, **BALDOCK**, and **MORITZ**, Circuit Judges.

_____

**MORITZ**, Circuit Judge.

_____

This appeal involves the constitutionality of a federal immigration statute that makes it a crime to encourage or induce a noncitizen[1] to reside in the United States, knowing or recklessly disregarding that such residence violates the law. 8 U.S.C. § 1324(a)(1)(A)(iv). After a jury convicted Jose Hernandez-Calvillo and Mauro Papalotzi (collectively, Appellees) of conspiring to commit this crime, they challenged the statute as overbroad under the First Amendment and successfully moved to dismiss the indictment on that basis. The government appeals.

We affirm. Section 1324(a)(1)(A)(iv)'s plain language targets protected speech, and neither the government's nor the dissent's proposed limiting construction finds support in the statute's text or surrounding context. And when properly construed, the statute criminalizes a substantial amount of constitutionally protected speech, creating a real danger that the statute will chill First Amendment expression.

_____

[1] Consistent with Supreme Court practice, except when directly quoting statutory language, we "use[] the term 'noncitizen' as equivalent to the statutory term 'alien.'" *Nasrallah v. Barr*, 140 S. Ct. 1683, 1689 n.2 (2020).

2

For these reasons, we conclude that § 1324(a)(1)(A)(iv) is substantially overbroad, and the district court properly dismissed the indictment.

## Background[2]

Appellees' convictions stem from their role in an alleged scheme to employ noncitizens in the drywall-installation business. At the heart of the operation was Jose R. Torres Drywall, a company run by Jose Torres-Garcia with the help of two other individuals, Marcos Stubbs and Isaac Gallegos. Despite what its name might suggest, Torres Drywall did no drywall work. Its true business was to act as a "financial intermediary" between construction companies and subcontracted construction crews primarily composed of noncitizens. App. vol. 3, 378. In a nutshell, the companies hired the crews for drywall projects and paid for the work by writing checks to Torres Drywall, whose operators in turn cashed the checks for the leaders of each crew (in exchange for a cut of the wages) so the leaders could pay their crew members. Torres Drywall also supplied the crews with insurance documents that the companies required before hiring the crews. Appellees each led construction crews that were paid by Torres Drywall for work performed for Keith Countess's drywall company, Plaster Masters, L.C.

Based on this scheme, a grand jury indicted Appellees, another crew leader, Stubbs, Gallegos, Plaster Masters, and Countess on several federal immigration

---

[2] Because this appeal arises from a motion to dismiss an indictment, we take these facts from the indictment. *See United States v. Todd*, 446 F.3d 1062, 1067 (10th Cir. 2006); *United States v. Sharpe*, 438 F.3d 1257, 1258–59 (11th Cir. 2006) (applying same standard to posttrial motion).

crimes.[3] The first count alleged that the defendants conspired to encourage or induce noncitizens to reside in the United States. *See* 8 U.S.C. § 1324(a)(1)(A)(iv) (punishing any person who "encourages or induces an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of law"), (v)(I) (proscribing "conspiracy to commit any of the preceding acts"). The remaining counts alleged specific instances of encouraging or inducing particular noncitizens to reside in the United States, or of aiding and abetting such encouragement or inducement, in violation of § 1324(a)(1)(A)(iv) and (v)(II).[4] The indictment did not allege that any of the noncitizens encouraged or induced to reside in the United States by this scheme were members of Appellees' crews. The government separately charged Torres-Garcia for his role in the scheme.

Only Appellees went to trial. The government dismissed the case against Plaster Masters. And the other individual defendants—Stubbs, Gallegos, Countess, the other crew leader, and Torres-Garcia—all pleaded guilty in exchange for favorable sentencing recommendations and agreeing to testify at Appellees' trial.

---

[3] This indictment marked the government's second attempt to prosecute these individuals and crimes. The first time around, the district court dismissed the charges against all defendants on speedy-trial grounds. The government initially appealed that dismissal but later abandoned the appeal, opting instead to refile a new indictment.

[4] The indictment included eight counts under these provisions, five of which the government voluntarily dismissed before trial.

At trial, Appellees proposed a jury instruction to define what it means to "encourage" or "induce" someone to unlawfully reside in the United States. The government opposed the instruction, arguing that the jury could give those terms their ordinary meaning based on its own understanding. The district court agreed, rejecting the instruction. And when, during deliberations, the jury requested "a different/further definition or clarification of 'intentionally induced or encouraged,'" the district court declined, instead instructing the jury to "use [its] collective judgment and experience to decide the issues." App. vol. 3, 464.

Ultimately, the jury found Appellees guilty of conspiring to encourage or induce but not guilty of the three individual counts of encouraging or inducing. Before sentencing, Appellees moved to dismiss the conspiracy count on First Amendment overbreadth grounds.[5] Specifically, they argued that the object of the conspiracy—encouraging or inducing noncitizens to reside in the United States under § 1324(a)(1)(A)(iv)—is facially unconstitutional because it proscribes a substantial amount of protected speech. The district court agreed and granted the motion, vacating Appellees' convictions and dismissing the indictment. The government appeals.

---

[5] Before trial, Appellees had moved to dismiss the indictment on the related ground that § 1324(a)(1)(A)(iv) is unconstitutionally vague. The government did not object to Appellees adding the overbreadth argument in their posttrial motion, and the district court found good cause to consider the motion. *See* Fed. R. Crim. P. 12(c)(3).

**Analysis**

The sole issue before us is a facial constitutional challenge to

§ 1324(a)(1)(A)(iv), which we refer to as subsection (A)(iv). Ordinarily, success on

such a challenge requires a showing that the statute at issue could never be applied in

a permissible, constitutional manner; all potential applications of the statute must be

unconstitutional. *See United States v. Stevens*, 559 U.S. 460, 472 (2010). But this

requirement is relaxed somewhat when, as here, a litigant attacks a statute as

overbroad under the First Amendment. *Id.* at 473. In that context, the party asserting

the facial challenge need only show that "a substantial number of [the statute's]

applications are unconstitutional, judged in relation to the statute's plainly legitimate

sweep."[6] *Id.* (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S.

442, 449 n.6 (2008)). Put more concretely, to prove a statute's overbreadth (and thus

its facially invalidity), the challenger must show that it "prohibits a substantial

amount of protected speech." *United States v. Williams*, 553 U.S. 285, 292 (2008).

Here, the government disputes the district court's determination that

subsection (A)(iv) is substantially overbroad. To resolve this dispute, we proceed in

two steps. First, we "construe the challenged statute," because "it is impossible to

determine whether a statute reaches too far without first knowing what the statute

---

[6] This relaxed standard for First Amendment overbreadth claims allows litigants to challenge a statute even if it may be applied constitutionally as to them. *See Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973). They may do so because, although "their own rights of free expression are [not] violated," "the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Id.*

covers." *Id.* at 293. Second, we consider "whether the statute, as we have construed it, criminalizes a substantial amount of protected expressi[on]." *Id.* at 297. At both steps, our review is de novo. *See United States v. Friday*, 525 F.3d 938, 948 (10th Cir. 2008) (reviewing dismissal de novo because district court based its decision on interpretation of governing criminal statutes); *United States v. Brune*, 767 F.3d 1009, 1015 (10th Cir. 2014) (reviewing First Amendment overbreadth claim de novo).

## I.    Statutory Construction

When assessing an overbreadth challenge, the usual rules of statutory construction apply. *See Brune*, 767 F.3d at 1022. As when interpreting any statute, we start with the statute's plain language and "assume that the legislative purpose is expressed by the ordinary meaning of the words used." *United States v. Torres-Laranega*, 476 F.3d 1148, 1157 (10th Cir. 2007) (quoting *FTC v. Kuykendall*, 466 F.3d 1149, 1154 (10th Cir. 2006)). We also consider the context in which the words appear in the overall statutory scheme. *See Brune*, 767 F.3d at 1022. If applying these tools produces "serious . . . doubts" about the statute's constitutionality, we "may impose a limiting construction on [the] statute" that avoids the constitutional problem. *Stevens*, 559 U.S. at 481 (first quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009); and then quoting *Reno v. Am. Civ. Liberties Union*, 521 U.S. 844, 884 (1997)). A limiting construction is appropriate, however, only if the statute is "readily susceptible" to one; we cannot "rewrite a . . . law to conform it to constitutional requirements." *Id.* (alteration in original) (quoting *Reno*, 521 U.S. at 884–85). Further, because we presume that Congress drafts constitutional legislation,

7

invalidation requires "a plain showing that Congress has exceeded its constitutional bounds." *United States v. Morrison*, 529 U.S. 598, 607 (2000).

Subsection (A)(iv), the provision challenged as overbroad here, makes it a crime to "encourage[] or induce[] an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of law."[7] § 1324(a)(1)(A)(iv). The district court adopted the Ninth Circuit's interpretation of this language from *United States v. Sineneng-Smith*, which considered an overbreadth challenge similar to the one Appellees raise here. 910 F.3d 461, 467 (9th Cir. 2018).[8] There, at the first step in the overbreadth analysis, the Ninth Circuit held that no "reasonable reading of the statute can exclude [protected] speech" from its ambit. *Id.* Put differently, the Ninth Circuit

---

[7] Notably, the statute punishes encouraging or inducing a noncitizen to reside in the United States even though such residence generally is not a criminal act. *See Arizona v. United States*, 567 U.S. 387, 407 (2012).

[8] Although *Sineneng-Smith* invalidated subsection (A)(iv) as overbroad, the Supreme Court reversed on procedural grounds, holding that the Ninth Circuit abused its discretion by considering the constitutional issue sua sponte. *See United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1578, 1581–82 (2020). The Court remanded with instructions to reconsider the appeal based on the issues presented by the parties, *id.* at 1582, and the Ninth Circuit ultimately affirmed the defendant's convictions without reaching the overbreadth question, *United States v. Sineneng-Smith*, 982 F.3d 766, 776 n.3, 777 (9th Cir. 2020), *cert. denied*, 142 S. Ct. 117 (2021). Despite the Court's reversal, we may consider the Ninth Circuit's initial overbreadth analysis to the extent we find it persuasive. *See Simes v. Huckabee*, 354 F.3d 823, 829 n.4 (8th Cir. 2004) (finding that "rationale underlying" Ninth Circuit decision later vacated by Supreme Court "on other grounds" "remain[ed] persuasive"). Moreover, when presented with the same overbreadth issue in a later case, the Ninth Circuit again held the statute overbroad, specifically relying on its prior "thorough analysis" in *Sineneng-Smith*, which it found "persuasive on the overbreadth issue." *United States v. Hansen*, 25 F.4th 1103, 1107 (9th Cir. 2022), *petition for reh'g en banc filed* (9th Cir. May 4, 2022).

determined that subsection (A)(iv) "is only susceptible to a construction that affects speech." *Id.* at 479. It primarily based that view on the statute's introductory verbs, "encourage[]" and "induce[]," § 1324(a)(1)(A)(iv), which can ordinarily refer to "speech, or conduct, or both," *Sineneng-Smith*, 910 F.3d at 475.

The government maintains that the Ninth Circuit (and thus the district court) misread subsection (A)(iv) because the statute does not use the words *encourage* and *induce* in their ordinary sense; instead, the government asserts, it uses them as synonyms for the criminal-law concepts of facilitation (also known as aiding or abetting) and solicitation. In other words, the government reads subsection (A)(iv) as targeting those who facilitate or solicit others to engage in certain illegal immigration activity—specifically, unlawfully "com[ing] to, enter[ing], or resid[ing] in the United States."[9] § 1324(a)(1)(A)(iv). And to the extent that a person could facilitate or solicit this activity using speech, the government says, the First Amendment would not protect such speech. *See Stevens*, 559 U.S. at 468 (listing "speech integral to criminal conduct" among categories of unprotected speech); *Williams*, 553 U.S. at 298. We consider each argument in turn.

### A.    The Meaning of *Encourage* and *Induce*

The government begins by noting that *encourage* and *induce* may sometimes refer to criminal facilitation or solicitation. For example, the government highlights

---

[9] Appellees contend that the government did not present this interpretation in the district court and has therefore waived it on appeal. Because we conclude the government's argument "fails on the merits," "[w]e need not opine on the waiver issue." *United States v. Wells*, 873 F.3d 1241, 1250 (10th Cir. 2017).

that Black's Law Dictionary's criminal-law definition of *encourage* refers readers to

the entry for *aid and abet*, a term that is itself synonymous with the term *criminal*

*facilitation*. *Encourage*, *Aid and Abet*, Black's Law Dictionary (11th ed. 2019). The

government also points to a federal statute that uses *induce* as one of several verbs to

describe the crime of "[s]olicitation to commit a crime of violence." 18 U.S.C.

§ 373(a) (making it a crime to "solicit[], command[], *induce*[], or otherwise

endeavor[] to persuade [another] person" to commit violent felony (emphasis

added)).

Yet the government's position puts the cart before the horse: Our construction

of subsection (A)(iv)'s terms begins with their ordinary meaning, not their

specialized meaning in criminal law. *See United States v. Thomas*, 939 F.3d 1121,

1123 (10th Cir. 2019) ("As a general rule, we interpret a word or phrase in a

statute . . . in accordance with its ordinary, everyday meaning.").[10] And the ordinary

meanings of *encourage* and *induce* encompass both conduct and speech. Indeed,

dictionary definitions from around the time Congress enacted subsection (A)(iv) use

broad language that could refer either to actions or verbal expression. *See Brune*, 767

---

[10] To be sure, not every case is "a plain[-]meaning case," particularly if the relevant language involves a term of art with a long "legal lineage." *Hall v. Hall*, 138 S. Ct. 1118, 1125 (2018). But as we explain in more detail above, the ordinary meaning controls in this context because the government's term-of-art definition "plainly do[es] not fit." *Thomas*, 939 F.3d at 1125 (quoting *Johnson v. United States*, 559 U.S. 133, 139–40 (2010)). Notably, our adherence to this interpretive principle tracks the government's position below, where the government urged the district court not to define *encourage* because the jury could "give the word its ordinary meaning." App. vol. 2, 303.

F.3d at 1022 ("An inquiry into a statutory term's meaning must consider the ordinary, contemporary meaning at the time Congress enacted the statute."). For example, *encourage* simply means "[t]o give courage to: inspire with courage, spirit, or hope: hearten," "to spur on: stimulate, incite," or "to give help or patronage to: foster." Webster's Third New International Dictionary 747 (Philip Babcock Gove ed. 1961). The definition of *induce* is similarly broad: "to move and lead (as by persuasion or influence)," "to inspire, call forth, or bring about by influence or stimulation." *Id.* at 1154. Based on these expansive definitions, then, subsection (A)(iv) covers not only conduct, but also speech—"one can encourage or induce with words, or deeds, or both."[11] *Sineneng-Smith*, 910 F.3d at 473; *see also Hansen*, 25 F.4th at 1107 (finding *Sineneng-Smith* "persuasive on the overbreadth issue" and merely "add[ing] . . . thoughts reinforcing that conclusion of overbreadth"); *Int'l Bhd. of Elec. Workers,*

---

[11] The government does not meaningfully dispute that *encourage* and *induce* ordinarily encompass both conduct and speech. Tellingly, the government avoids citing definitions of *encourage* from nonlegal dictionaries, instead noting that such dictionaries use *encourage* when defining *abet* (a word found nowhere in subsection (A)(iv)). But as Appellees note, "the mere fact that 'abet' can be defined as 'encourage' does not mean that 'encourage' *only* means 'abet.'" Aplees. Br. 22. What's more, the dictionaries the government cites to define *abet*—including Webster's Third, cited above—support Appellees' position that *encourage* encompasses speech. *See, e.g.*, Webster's New International Dictionary of the English Language 843 (2d ed. 1950) (*encourage* means "1. [t]o give courage to; to inspire with courage, spirit, or hope; to raise the confidence of; to animate; hearten," and "2. [t]o embolden, incite, or induce as by inspiration, recommendation, etc.; hence, to advise"). The same is true of the government's sole nonlegal definition of *induce. See Webster's New World College Dictionary* 742 (5th ed. 2014) (defining *induce* to mean "to lead on to some action" or "to bring on; bring about").

11

*Loc. 501 v. NLRB*, 341 U.S. 694, 701–02 (1951) ("The words 'induce or encourage' are broad enough to include in them every form of influence and persuasion.").

Other language in § 1324 confirms that Congress used *encourage* and *induce* in their ordinary sense, not in their more limited and specialized criminal-law sense. For one thing, if Congress intended this specialized meaning, there would be a potential overlap between subsections (A)(iii) ("conceals, harbors, or shields from detection" a noncitizen) and (A)(iv) ("encourages or induces an alien to come to, enter, or reside in the United States"). *See United States v. Smith*, 756 F.3d 1179, 1187 (10th Cir. 2014) (noting "our duty to give effect, if possible, to every clause . . . of a statute" and "reluctan[ce] to treat statutory terms as surplusage in any setting" (quoting *Duncan v. Walker*, 533 U.S. 167, 167 (2001))). And crucially, the very next subsection makes it a crime to "aid[] or abet[]" any of the offenses proscribed in the preceding subsections, including subsection (A)(iv). § 1324(a)(1)(A)(v)(II). This explicit reference to aiding and abetting shows that Congress knows how to draft a facilitation provision. Yet it used entirely different language in subsection (A)(iv), and we generally presume that "different meanings [are] intended" when Congress uses "certain language in one part of [a] statute and different language in another."[12] *Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9

---

[12] This presumption is especially strong here given the historical progression of the two provisions. Congress added the aiding-and-abetting provision decades *after* adding the encourage-or-induce language in subsection (A)(iv). *Compare* Immigration and Nationality Act of 1952, Pub. L. No. 82-414, § 274(a)(4), 66 Stat. 163, 228–229, *with* Omnibus Consolidated Appropriations Act of 1997, Pub. L. No. 104-208, Div. C., Tit. II, Subtit. A., § 203(b)(1), 110 Stat. 3009, 3009–565. The government's interpretation would require us to accept that Congress inexplicably used two different phrases in two neighboring subsections to refer to the same

(2004) (quoting 21 Singer, Statutes and Statutory Construction § 46.06 (6th rev. ed. 2000)). Disregarding this presumption would render the aiding-and-abetting provision redundant in subsection (A)(iv) cases because that provision (according to the government) already covers aiding and abetting. *See Hansen*, 25 F.4th at 1108–09 (noting that "§ 1324(a)(1)(A) already includes an aiding[-]and[-]abetting provision," which "strongly suggests that subsection [A](iv) should not also be read as an aiding[- and[- abetting provision"). Though not dispositive, this redundancy provides yet another "clue as to the better interpretation of [the] statute." *Rimini St., Inc. v. Oracle USA, Inc.*, 139 S. Ct. 873, 881 (2019).

Further, subsection (A)(iv) bears no resemblance to other facilitation-or-solicitation statutes. In each of the government's examples of such statutes, the drafters included the terms *encourage* or *induce* among various other verbs that convey facilitation or solicitation. Consider the federal accomplice-liability statute cited by the government: It applies to anyone who "aids, abets, counsels, commands, *induces*[,] or procures" the commission of a federal crime. 18 U.S.C. § 2(a) (emphasis added). Likewise, the dozens of state statutes the government cites similarly include *encourage* or *induce* among a string of other facilitation-or-

---

concept and added the second even though the first already did all or much of the work of the second. Or, as Appellees put it, this interpretation would require us to accept that "Congress intended to criminalize aiding and abetting aiding and abetting." Aplee. Br. 22. This absurd result further undermines the government's interpretation. *Cf. Sunshine Haven Nursing Operations, LLC v. U.S. Dep't of Health & Hum. Servs.*, 742 F.3d 1239, 1250 (10th Cir. 2014) (discussing preference for avoiding interpretations that produce absurd results).

solicitation verbs. *See, e.g.*, Colo. Rev. Stat. §§ 18-1-603 (treating anyone who "aids, abets, advises, or *encourages*" another person to commit offense as principal (emphasis added)), 18-2-301(1) (providing that solicitation occurs when someone "commands, *induces*, entreats, or otherwise attempts to persuade another person . . . to commit a felony" (emphasis added)). In each sample statute, the verbs accompanying *encourage* or *induce* narrow their "multiple and wide-ranging meanings" under the *noscitur a sociis* canon, "which counsels that a word is given more precise content by the neighboring words with which it is associated." *Williams*, 553 U.S. at 294; *see also id.* at 294–95 (construing verb string "advertises, promotes, presents, distributes, or solicits" as "hav[ing] a transactional connotation," even though *promotes* and *presents* are susceptible to broader definitions "[w]hen taken in isolation," because accompanying verbs ruled out those broader, nontransactional definitions). But that canon doesn't apply here because there are no neighboring verbs in subsection (A)(iv) that narrow the meaning of *encourage* and *induce*. *See Hansen*, 25 F.4th at 1108 (concluding that "*noscitur a sociis* does not apply" to subsection (A)(iv) because "[e]ncourage and induce are not part of a series of words that shed additional light on their meaning"); *United States v. Franklin*, 785 F.3d 1365, 1369 (10th Cir. 2015) (concluding that "a list of two words" is "too short for application of the canon of *noscitur a sociis*"). The government cites no statute— and our own research reveals none—in which the words *encourage* or *induce* appear

14

by themselves (or together) as substitutes for facilitation or solicitation, casting further doubt on the government's interpretation.[13]

Moreover, subsection (A)(iv)'s substantive coverage exceeds what one would expect to find in a statute proscribing facilitation or solicitation. Both facilitation and solicitation generally require some underlying *criminal* conduct; facilitating or soliciting *civilly* unlawful activity is not enough. *See* 2 LaFave, Subst. Crim. L. § 11.1 (3d ed.) (stating that offender must solicit another person "to commit a crime"); *id.* § 13.3(c) (explaining that accomplice liability does not attach "[i]f the acts of the principal . . . are found not to be criminal"). Yet some of the activity that subsection (A)(iv) prohibits a person from encouraging or inducing—namely, "resid[ing] in the United States," § 1324(a)(1)(A)(iv)—is not a crime. *See Arizona v. United States*, 567 U.S. 387, 407 (2012) ("As a general rule, it is not a crime for a removable [noncitizen] to remain present in the United States."). Facilitation and solicitation also typically require a specific intent that the other party commit the underlying offense. *See* 2 LaFave, Subst. Crim. L. § 11.1 (noting requirement that

---

[13] On the other hand, as Appellees point out, a different immigration statute expressly conveys facilitation or solicitation by including *encourage* and *induce* among a string of other verbs that includes *aid* and *abet*. *See* 8 U.S.C. § 1182(a)(6)(E)(i) ("Any alien who at any time knowingly has encouraged, induced, assisted, abetted, or aided any other alien to enter or to try to enter the United States in violation of law is inadmissible."); *Marquez-Reyes v. Garland*, No. 17-71367, 2022 WL 2127237, at *7 (9th Cir. June 14, 2022) (construing *encourage* in § 1182(a)(6)(E)(i) to cover solicitation and facilitation in part because, unlike in § 1324(a)(1)(A)(iv), term appears among verb string that triggers *noscitur a sociis* canon). This strengthens our conclusion that Congress knows how to draft a facilitation-or-solicitation statute and did not do so in subsection (A)(iv).

solicitor "inten[d] that another person commit [the] crime"); *id.* § 13.2 (explaining

that accomplice must not only assist principal but must do so "with the intent thereby

to promote or facilitate commission of the crime"). Not so with subsection (A)(iv):

Its sole state-of-mind element relates to the defendant's knowledge that a

noncitizen's "coming to, entry, or residence" violates the law.[14] § 1324(a)(1)(A)(iv).

That Congress omitted these hallmarks of facilitation and solicitation—specific intent

and resulting criminal conduct—bolsters our conclusion that subsection (A)(iv) uses

*encourage* and *induce* in their ordinary, speech-encompassing sense. *See Hansen*, 25

F.4th at 1109 (rejecting government's interpretation of subsection (A)(iv) as

aiding-and-abetting statute in part because "the elements necessary for an

aiding[-]and[-]abetting conviction . . . require that the government prove elements not

contained in subsection[A](iv)").

Ultimately, subsection (A)(iv) cannot bear the government's limiting

construction.[15] The ordinary meanings of *encourage* and *induce* encompass both

---

[14] In fact, a 1986 amendment to subsection (A)(iv) eliminated a requirement that the offender "willfully and knowingly" encourage or induce the unlawful conduct. *See* Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, § 112(a), 100 Stat. 3359, 3381–82.

[15] We decline to address the government's alternative limiting construction, borrowed from *DelRio-Mocci v. Connolly Properties Inc.*, 672 F.3d 241 (3d Cir. 2012), that the defendant's encouragement or inducement must be "substantial." Rep. Br. 13. The government waived this limiting construction by raising it for the first time in its reply brief. *See United States v. Leffler*, 942 F.3d 1192, 1197 (10th Cir. 2019). And even if we exercised our discretion to consider the government's waived argument, we would reject it because the Third Circuit's approach adds a "substantiality" requirement found nowhere in the statutory text. *See Exby-Stolley v. Bd. of Cnty. Commissioners*, 979 F.3d 784, 971, 810 (10th Cir. 2020) (en banc) (rejecting interpretation that "added language to the [statute's] plain text" because

conduct and speech, and nothing in the statutory language or surrounding context suggests that Congress gave those terms a narrower meaning akin to the criminal-law concepts of facilitation and solicitation.

The novel limiting construction devised by the dissent fares no better. Unlike the government, the dissent reads subsection (A)(iv) as targeting only the solicitation, but not the facilitation, of criminal violations of immigration law.[16] To arrive at this interpretation, the dissent essentially concludes that Congress must have used *encourage* and *induce* to convey the criminal-law concept of solicitation (and all its associated requirements) because subsection (A)(iv) is a criminal statute. But all the textual clues discussed above—especially the absence of any accompanying verbs suggesting a narrower meaning of *encourage* and *induce*—make clear that Congress used the broader, ordinary meaning of those terms. Accepting the dissent's reading,

---

such interpretations are "generally impermissible"), *cert. denied* 141 S. Ct. 2858 (2021).

[16] The dissent's attempt to distance itself from the government's view—that subsection (A)(iv) also reaches facilitation—is understandable, albeit unsuccessful. If the words "encourages or induces" cover facilitation, then the dissent's argument (like the government's) runs into the roadblock created by Congress's prohibition of facilitation (aiding and abetting) in § 1324(a)(1)(A)(v)(II). *See* discussion *supra* pp. 12–13. The dissent tries to avoid this tension by broadly declaring the facilitation component of the government's interpretation "unpersuasive given the language's clear support for solicitation." Dissent 10. But the natural extension of the dissent's suggestion that Congress used *encourage* and *induce* only in their criminal-law sense would require that subsection (A)(iv) also cover facilitation. *See* Black's Law Dictionary (10th ed. 2014) (defining *encourage* as synonymous with *aid and abet*, and *aid and abet* as synonymous with *criminal facilitation*). The dissent cannot have it both ways: Either the verbs in subsection (A)(iv) are limited to their criminal-law definitions and thus encompass both solicitation *and* facilitation, or they are not so limited and thus encompass far more conduct than solicitation and facilitation.

then, would require replacing the phrase "encourages or induces" with the term "solicits." Because both the dissent and the government "rewrite" the statute's plain language, we reject those approaches and conclude that subsection (A)(iv) is not "readily susceptible" to a limiting construction. *Stevens*, 559 U.S. at 481 (quoting *Reno*, 521 U.S. at 884).

### B.    Protected Speech

Our conclusion that subsection (A)(iv) reaches at least some speech does not end the analysis, of course, because the First Amendment does not protect all kinds of speech. Indeed, the Supreme Court has long recognized several "narrowly limited" categories of unprotected speech, "the prevention and punishment of which . . . raise [no] [c]onstitutional problem." *Stevens*, 559 U.S. at 469 (quoting *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571–72 (1942)). These categories include "obscenity, defamation, fraud, incitement, and speech integral to criminal conduct." *Id.* at 468 (citations omitted). The government invokes the last category, arguing that any speech covered by subsection (A)(iv) is unprotected because it is "integral to criminal conduct." Aplt. Br. 36 (quoting *Stevens*, 559 U.S. at 468).

But based on our construction of subsection (A)(iv), this narrow category does not cover all the speech the statute can reach. As we explained earlier, subsection (A)(iv) prevents a person from encouraging or inducing a noncitizen to "reside in the United States," § 1324(a)(1)(A)(iv), even though such residence is not a crime. *See Arizona*, 567 U.S. at 407. It is thus possible under subsection (A)(iv) to punish speech encouraging an act that is only civilly unlawful. So in at least some cases, the

18

narrow category of unprotected "speech integral to *criminal* conduct" will not apply.[17] *Stevens*, 559 U.S. at 468 (emphasis added).

Notably, subsection (A)(iv)'s language is also broad enough to sweep in even protected "abstract advocacy of illegality."[18] *Williams*, 553 U.S. at 298–99; *see also Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 253 (2002) ("The mere tendency of speech to encourage unlawful acts is not a sufficient reason for banning it."). Again, subsection (A)(iv) does not require specific intent that a noncitizen commit unlawful immigration conduct. Nor does it require that such unlawful conduct ever occurs— simply encouraging someone to come to, enter, or reside in the United States (either knowing or recklessly disregarding that person's unlawful status) violates subsection (A)(iv), regardless of whether the noncitizen actually comes to, enters, or resides in

---

[17] We reject the government's suggestion that this category of unprotected speech includes speech integral to unlawful activity of any kind, civil or criminal. The Supreme Court has described the category as covering only speech integral to "criminal conduct." *Stevens*, 559 U.S. at 468. Indeed, the case first recognizing this category confirms its limited application to speech "used as an integral part of conduct in violation of a valid *criminal* statute." *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 498 (1949) (emphasis added). The government supports its contrary view with cases involving a different category of unprotected expression— "[o]ffers to engage in illegal transactions." *Williams*, 553 U.S. at 297; *see also Pittsburg Press Co. v. Pittsburgh Comm'n on Hum. Relations*, 413 U.S. 376, 387–88 (1973) (upholding ordinance barring newspaper from publishing advertisements for transactions that were unlawful under both civil and criminal laws). No one argues that this transactional category applies here, so the government's reliance on these cases is misplaced.

[18] The First Amendment protects such advocacy so long as it is neither "directed to inciting or producing imminent lawless action" nor "likely to incite or produce such action." *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) (per curiam). The government does not suggest that this exception would apply to speech advocating the illegal immigration conduct subsection (A)(iv) proscribes.

the United States. So the statement to a noncitizen, "I encourage you to [reside in the United States]," would support a conviction under subsection (A)(iv), even if the noncitizen takes no action in response to the encouragement. *Williams*, 553 U.S. at 300.

In sum, applying ordinary principles of statutory construction, we conclude that subsection (A)(iv) proscribes at least some protected speech. Next, we consider whether the statute, "as we have construed it," proscribes so much protected speech that it violates the First Amendment. *Id.* at 297.

## II.    Overbreadth

Although subsection (A)(iv) criminalizes some protected speech, the provision is facially overbroad only if it criminalizes "a *substantial amount* of protected speech." *Williams*, 553 U.S. at 292 (emphasis added). Or, in more practical terms, "a substantial number of instances [must] exist in which [subsection (A)(iv)] cannot be applied constitutionally." *N.Y. State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 14 (1988). That number must be substantial "not only in an absolute sense, but also relative to the statute's plainly legitimate sweep." *Williams*, 553 U.S. at 292. So to assess subsection (A)(iv)'s overbreadth, we must compare its "legitimate and illegitimate applications."[19] *Harmon v. City of Norman*, 981 F.3d 1141, 1153 (10th

---

[19] The government contends that in making this comparison, we should only consider applications of subsection (A)(iv) that would also implicate a sentencing enhancement that applies when the defendant commits the offense "for the purpose of commercial advantage or private financial gain." § 1324(a)(1)(B)(i). Although the indictment and jury instructions use language from this enhancement, the enhancement does not apply to Appellees' offense—*conspiracy* to violate subsection

Cir. 2020) (quoting 1 Smolla & Nimmer on Freedom of Speech, § 6:6). We may invalidate subsection (A)(iv) as overbroad only if this comparison reveals "a realistic danger that the statute . . . will significantly compromise recognized First Amendment protections of parties not before [us]." *N.Y. State Club Ass'n*, 487 U.S. at 11 (quoting *Members of City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 801 (1984)).

We start by assessing subsection (A)(iv)'s constitutionally permissible applications. The government maintains that subsection (A)(iv) covers a wide range of "significant real-world criminal activity." Aplt. Br. 32. It points to criminal activity related to (1) procuring and providing fraudulent documents to noncitizens, (2) helping noncitizens enter the United States, (3) luring noncitizens for unlawful work, and (4) smuggling activities.

But for each of the government's examples, as Appellees note, other statutes independently—and more narrowly—proscribe these activities. For instance, various statutes criminalize and punish document fraud. *See* 18 U.S.C. § 1546 (criminalizing creation, dissemination, and use of fraudulent immigration documents); 8 U.S.C. § 1324c (punishing immigration document fraud); 18 U.S.C. § 1546 (addressing

---

(A)(iv), in violation of subsection (A)(v)(I). *See* § 1324(a)(1)(B)(i) (applying enhancement to violations of subsections "(A)(ii), (iii), or (iv)"). And at any rate, a conspiracy charge already carries a ten-year maximum sentence—the same length as the enhancement. *See* § 1324(a)(1)(B)(i). The enhancement is therefore not an element of Appellees' crimes, as it does not "alter[ their] statutory sentencing range." *United States v. Cassius*, 777 F.3d 1093, 1097 (10th Cir. 2015) (emphasis omitted). Accordingly, the enhancement does not factor into our assessment of subsection (A)(iv)'s overbreadth.

21

"[f]raud and misuse of visas, permits, and other documents"). What's more, even without subsection (A)(iv), the government could secure those prosecutions under subsection (A)'s remaining provisions, which criminalize "bring[ing]," "transport[ing]," "mov[ing]," "conceal[ing]," "harbor[ing]," or "shield[ing]" noncitizens from detection. § 1324(a)(1)(A)(i)–(iii); *see, e.g.*, *United States v. Martinez-Candejas*, 347 F.3d 853, 854 (10th Cir. 2003) (describing § 1324(a)(1)(A) as "proscrib[ing] a broad range of interrelated [noncitizen] smuggling activities, including bringing in, transporting, harboring, [and] encouraging to enter or reside"). The Ninth Circuit noted as much in *Hansen*, explaining that many legitimate applications of subsection (A)(iv) are "encompassed by the other subsections of [§] 1324(a)(1)(A), leaving subsection [A](iv)'s plainly legitimate sweep little independent work to do." *Hansen*, 25 F.4th at 1109. The availability of these alternative prosecutorial tools dilutes the force of subsection (A)(iv)'s legitimate applications. *See Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 609 (1967) ("The breadth of legislative abridgment must be viewed in the light of less drastic means for achieving the same basic purpose." (quoting *Shelton v. Tucker*, 364 U.S. 479, 488 (1960))); *cf. also Younger v. Harris*, 401 U.S. 37, 51 (1971) ("[I]t is well settled that [a] statute can be upheld if the effect on speech is minor in relation to the need for control of the conduct and *the lack of alternative means for doing so*." (emphasis added)).

When asked at oral argument to identify an example of unprotected, proscribable speech or conduct that could only be prosecuted under subsection

22

(A)(iv), the government pointed to *United States v. Kalu*, 791 F.3d 1194 (10th Cir. 2015), *Sineneng-Smith*, and this case. But these examples only prove subsection (A)(iv)'s redundancy.

The first two examples both involved a host of additional charges on top of a subsection (A)(iv) offense. In *Kalu*, the government secured convictions on 89 counts for mail fraud (18 U.S.C. § 1341), visa fraud (18 U.S.C. § 1546), forced labor (18 U.S.C. § 1589), trafficking in forced labor (18 U.S.C. § 1590), money laundering (18 U.S.C. § 1956), *and* encouragement and inducement under subsection (A)(iv). 791 F.3d at 1197. The government did not explain what aspect of the conduct in *Kalu* might have gone unpunished if not for subsection (A)(iv). And in *Sineneng-Smith*, besides the subsection (A)(iv) convictions, the government also obtained convictions for mail and tax fraud.[20] *See* 910 F.3d at 468 & n.2. If anything, *Kalu* and *Sineneng-Smith* display the vast array of enforcement tools available to the government.

So does this case, the government's final example of conduct proscribed solely by subsection (A)(iv). Here too, the government secured convictions for other crimes—another crew leader pleaded guilty to hiring a noncitizen in violation of 8 U.S.C. § 1324a(a)(1)(A), and Torres separately pleaded guilty to conducting an unlicensed money-transmitting business in violation of 18 U.S.C. 1960. Instead of focusing on these convictions, the government points to Appellees' particular

---

[20] Similarly, in the more recent Ninth Circuit decision striking down subsection (A)(iv) as overbroad, the government independently convicted the defendant of mail- and wire-fraud offenses. *Hansen*, 25 F.4th at 1105.

conduct, arguing that only subsection (A)(iv) "cover[s] their participation in a scheme designed to pay and putatively insure unlawfully present [noncitizens]." Rep. Br. 6. But the government has prosecuted similar conduct as "conceal[ing], harbor[ing], or shield[ing] from detection" under subsection (A)(iii). *E.g.*, *United States v. Ye*, 588 F.3d 411, 417 (7th Cir. 2009) (concluding that government showed defendant's "inten[t] to prevent the government from detecting" noncitizens in part with evidence that defendant "paid [them] in cash"); *cf. also Edwards v. Prime, Inc.*, 602 F.3d 1276, 1299 (11th Cir. 2010) (finding, in racketeering action, sufficient evidence of underlying subsection (A)(iii) violation based in part on evidence that defendants "paid [noncitizens] in cash in order to conceal, harbor, and shield the[m] from detection").[21]

And even if no other statute covers Appellees' conduct, the number of potential illegitimate applications of subsection (A)(iv)—explored below—far outnumber the legitimate applications involving such conduct. Thus, the government's three examples ultimately offer little support for the claim that subsection (A)(iv) covers "significant real-world criminal activity." Aplt. Br. 32.

On the other side of the ledger, we are convinced that many of subsection (A)(iv)'s potential applications involve protected speech. As Appellees note, the

---

[21] Notably, the indictment here alleges that the conspirators, including Appellees, used Torres Drywall's services "to maintain a stable of undocumented [noncitizen] workers who, because they are unlawfully present in the United States, . . . cannot easily open and maintain accounts at U.S. financial institutions, and therefore must be paid in cash to maintain their residence in the United States." App. vol. 3, 385.

statute punishes "any words spoken in encouragement of a[] . . . noncitizen's continued residence in the United States, so long as the speaker knows or recklessly disregards the noncitizen's immigration status." Aplees. Br. 39. And recall that, as we noted when interpreting the statute, the defendant's encouraging words need not have any effect on the listener. Plus, the statute's sole exception—which permits religious organizations to encourage noncitizens who already reside in the United States to volunteer as "a minister or missionary," § 1324(a)(1)(C)—is even narrower than the exception in the statute invalidated as overbroad in *Stevens*. *See* 559 U.S. at 477–78 (noting exception in federal statute criminalizing animal-cruelty depictions for speech having "serious religious, political, scientific, educational, journalistic, historical, or artistic value" (quoting 18 U.S.C. § 48 (2010)). All other encouragement and inducement is covered.

It is reasonable to conclude that vast amounts of protected speech would be swept up in a "criminal prohibition of [such] alarming breadth." *Stevens*, 559 U.S. at 474. The statute makes it a crime, for example, to tell a family member who has overstayed his or her visa, "I encourage you to reside in the United States"; to "tell[] a tourist that she is unlikely to face serious consequences if she overstays her tourist visa"; or to inform a noncitizen "about available social services." *Hansen*, 25 F.4th at 1110. And an immigration attorney could face prosecution for "providing certain legal advice to [noncitizens]." *Id.* Although impossible to quantify with exact precision, these "commonplace statements" are "likely repeated countless times across the country every day." *Hansen*, 25 F.4th at 1110. As a result, subsection

25

(A)(iv) is surely "violated scores of times daily."[22] *City of Houston v. Hill*, 482 U.S. 451, 466 (1987); *see also id.* at 467 (concluding that challenged ordinance was substantially overbroad because it was "susceptible of regular application to protected expression").

The government downplays these examples as "fanciful hypotheticals," emphasizing the lack of actual prosecutions involving protected speech.[23] Aplt. Br. 36 (quoting *Williams*, 553 U.S. at 301). But actual prosecutions are not required to prove a statute's overbreadth. *See N.Y. State Club Ass'n*, 487 U.S. at 14 (requiring showing of substantial overbreadth "from the text of [the challenged law] *and* from actual fact that a substantial number of instances exist in which the [l]aw cannot be applied constitutionally" (emphasis added)); *Broadrick*, 413 U.S. at 612 (balancing "the *possible harm* to society in permitting some unprotected speech to go unpunished" against "the *possibility* that protected speech of others may be muted and perceived grievances left to fester because of the possible inhibitory effects of

---

[22] We accordingly disagree with the Fourth Circuit's cursory, unexplained view—expressed in an unpublished opinion—that "[a]lthough there may be some instances in which" subsection (A)(iv) proscribes protected speech, those instances do not amount to "a substantial amount of such speech." *United States v. Tracy*, 456 F. App'x 267, 272 (4th Cir. 2011) (unpublished).

[23] The dissent similarly faults our reliance on what it views as "fanciful hypotheticals." Dissent 3 (quoting *Williams*, 553 U.S. at 301). This criticism falls flat, however, given the dissent's recognition that the statute covers these scenarios if our reading of the statute is correct. *See id.* at 12 (arguing that there is "no reason to rely on these 'fanciful hypotheticals'" because subsection (A)(iv), when narrowly construed as a solicitation provision, does not reach them (quoting *Williams*, 553 U.S. at 301)). Indeed, the dissent acknowledges that if our broad reading is correct, "then the natural, almost inevitable result of the second step is the conclusion that the statute is overbroad." *Id.* at 4.

overly broad statutes" (emphases added)). The First Amendment "does not leave us at the mercy of *noblesse oblige*," and we will not "uphold an unconstitutional statute merely because the [g]overnment promise[s] to use it responsibly."[24] *Stevens*, 559 U.S. at 480. And in any event, the examples above are not so fanciful considering the government's prosecution in *United States v. Henderson*, 857 F. Supp. 2d 191 (D. Mass. 2012).

In *Henderson*, the government brought a subsection (A)(iv) charge against a federal immigration official for encouraging her housekeeper, a noncitizen, to remain in the United States by "advis[ing] the [housekeeper] generally about immigration law." 857 F. Supp. 2d at 193. This advice included the statement, "[I]f you leave[,] they won't let you back." *Id.* at 196. When questioned by the trial judge about subsection (A)(iv)'s scope at a hearing, the prosecutor "contended that an immigration lawyer would be prosecutable" under subsection (A)(iv) "if he [or she] advised a[] [noncitizen] client to remain the country because if the [noncitizen] were to leave[, that person] could not return to seek adjustment of status." *Id.* at 203. The prosecutor took this position even though the immigration lawyer would be advising the client on "how to pursue entirely legal processes." *Id.* at 204.

The government counters that *Henderson* does not count as an actual prosecution for protected speech because the colloquy with the trial judge was about

---

[24] French for "nobility obligates," *noblesse oblige* refers to "the obligation of honorable, generous, and responsible behavior associated with high rank or birth," or, as applied in this situation, the obligation of federal prosecutors to act responsibly. Merriam-Webster's Collegiate Dictionary 840 (11th ed. 2003).

a hypothetical immigration lawyer. But in *Henderson* itself, the government relied on speech (the statement "if you leave[,] they won't let you back") to support the conviction. *Id.* at 196. *Henderson* thus supplies evidence both of a speech-based prosecution under subsection (A)(iv) and of the "realistic danger" that the government may pursue such prosecutions in the future. *N.Y. State Club Ass'n*, 487 U.S. at 11 (quoting *Taxpayers for Vincent*, 466 U.S. at 801).

As a final matter, the government's emphasis on the dearth of subsection (A)(iv) prosecutions and convictions based solely on protected speech rings hollow. In the government's view, because "immigration advocacy groups and service providers openly engage" in the activities from our earlier examples, they "evident[ly] belie[ve] that they have been free to do so." Rep. Br. 12. And so, the government maintains, their ongoing open engagement proves subsection (A)(iv) has not chilled their activities.

Yet even if the government's current use of subsection (A)(iv) to prosecute pure speech is sporadic, that fact does not, by itself, prove that subsection (A)(iv) does not prohibit or chill protected speech. After all, the government could still use an overbroad statute to prosecute defendants and obtain convictions in the future. And subsection (A)(iv)'s mere existence may chill speech now and in the future. *See Broadrick*, 413 U.S. at 612 ("[A] statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression."). That some groups and individuals may persist in constitutionally protected speech despite fear of prosecution says nothing about those who do not because of their fear of

28

prosecution. *See id.* (explaining that First Amendment overbreadth challenges may stem from "a judicial prediction or assumption that the statute's very existence may cause others . . . to refrain from constitutionally protected speech or expression").

In the end, the comparison of subsection (A)(iv)'s constitutional and unconstitutional applications is one-sided. Based on the government's examples, the statute mostly (if not entirely) proscribes conduct already made criminal by other statutes. We are therefore not convinced that invalidating subsection (A)(iv) would deprive the government of a critical enforcement tool or leave wide swaths of criminal conduct unpunished. And as much as there are some legitimate applications of subsection (A)(iv), they pale in comparison to the illegitimate ones. The statute's plain language is "susceptible of regular application to protected expression," reaching vast amounts of protected speech uttered daily. *Hill*, 482 U.S. at 466. For these reasons, we hold that subsection (A)(iv) is substantially overbroad under the First Amendment.[25] Accordingly, we affirm the dismissal of the indictment.

---

[25] Appellees do not argue that any other part of § 1324 is overbroad. Accordingly, because "the unconstitutional language" in subsection (A)(iv) "is severable from the remainder of the statute," we leave the remainder of § 1324 intact. *Citizens for Responsible Gov't State Pol. Action Comm. v. Davidson*, 236 F.3d 1174, 1194 (10th Cir. 2000).

*United States v. Hernandez & United States v. Papalotzi*, Nos. 19-3210 & 19-3211
**BALDOCK**, J., dissenting,

The Court makes this case much harder than it need. If we consider an ordinary, common-sense definition of the words "encourage" and "induce" together with the Supreme Court's instructions for overbreadth cases, 8 U.S.C. § 1324(a)(1)(A)(iv) is a solicitation statute and nothing more. To be sure, the Government overplays its hand by suggesting it also encompasses facilitation. Nevertheless, that is an inadequate reason for us to declare the statute unconstitutionally overbroad when it is otherwise subject to a reasonable and constitutional construction.

Overbreadth cases require us to balance inherently contradictory interests. On the one hand, we seek to vindicate important First Amendment rights and avoid chilling protected speech. *United States v. Williams*, 553 U.S. 285, 292 (2008). On the other hand, we are conscious of the "obvious harmful effects" associated with unnecessarily invalidating laws. *Id.* Reflecting this latter concern, the Supreme Court describes overbreadth as "strong medicine" and has expressed a preference for us to avoid constitutional problems by subjecting statutes to reasonable limiting constructions. *Id.* at 293; *New York v. Ferber*, 458 U.S. 747, 769 n.24 (1982).

The statute at issue today is readily susceptible to such a construction. When reasonably construed, § 1324(a)(1)(A)(iv) makes it a crime to solicit criminal violations of immigration law. Accordingly, the statute necessarily requires the perpetrator to specifically intend to solicit an act that he knows is such a criminal violation or be in reckless disregard of the fact. *See, e.g.*, *Intent: Specific Intent*, Black's Law Dictionary

(10th ed. 2014) (listing solicitation as a specific intent crime at common law).  Under this reading, the statute is not unconstitutionally overbroad because any speech criminalized by it is "integral to criminal conduct" and unprotected by the First Amendment.  *United States v. Stevens*, 559 U.S. 460, 468 (2010).  The Court, however, insists on declaring the statute overbroad.  Because I believe our decision erroneously invalidates the statute, I respectfully dissent.

## I.

Let us begin by providing some context on the overbreadth analysis.  We start with the principle that "[i]nvalidation for overbreadth is 'strong medicine' that is not to be 'casually employed.'"  *Williams*, 553 U.S. at 293 (cleaned up) (quoting *LAPD v. United Reporting Publ'g Corp.*, 528 U.S. 32, 39 (1999)).  The Supreme Court has repeatedly warned us against cavalier applications of the doctrine and "vigorously enforced the requirement that a statute's overbreadth be *substantial*, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep."  *Id.* at 292 (citing *Bd. of Trs. of SUNY v. Fox*, 492 U.S. 469, 485 (1989); *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973)).  The Supreme Court's guidance on statutory construction, as it applies in cases of alleged overbreadth, reflects this principle.  For example, we must presume that every statute Congress enacts is constitutional.  *See United States v. Morrison*, 529 U.S. 598, 607 (2000); *see also United States v. Carel*, 668 F.3d 1211, 1216 (10th Cir. 2011).  We therefore approach cases like this one with a certain reluctance to invalidate the statute.  Only in cases where it is abundantly clear that the statute cannot comport with the Constitution's

2

requirements will we resort to invalidating a statute as overbroad. *See Williams*, 553 U.S. at 293.

Further reflecting this principle is the Supreme Court's instruction that we should, whenever possible, find reasonable limiting constructions for the challenged statutory meaning that may save the provision from invalidation. *Crowell v. Benson*, 285 U.S. 22, 62 (1932); *Ferber*, 458 U.S. at 769 n.24. This, of course, is predicated on the requirement that "the statute is subject to such a limiting construction." *Ferber*, 458 U.S. at 769 n.24. The Supreme Court has cautioned us that we "may impose a limiting construction on a statute only if it is 'readily susceptible' to such a construction" and that we cannot "rewrite a law to conform it to constitutional requirements." *Stevens*, 559 U.S. at 481 (cleaned up) (quoting *Reno v. ACLU*, 521 U.S. 844, 884–85 (1997)). We nevertheless retain a relatively wide avenue to reinterpret statutes. *See id.* (distinguishing between rewriting and reinterpreting a statute). Finally, although the task of evaluating overbreadth challenges is necessarily abstract, we must not, as this Court does, rely on "fanciful hypotheticals" as our justification for invalidating a statute. *Williams*, 553 U.S. at 301 (noting "the tendency of our overbreadth doctrine to summon forth an endless stream of fanciful hypotheticals"); *United States v. Sineneng-Smith* (*Sineneng-Smith II*), 140 S. Ct. 1575, 1586 (2020) (Thomas, J., concurring) (same).

## II.

Next, let us proceed to the overbreadth analysis as it applies to § 1324(a)(1)(A)(iv). As this Court correctly explains, overbreadth analysis consists of two steps. "The first step in overbreadth analysis is to construe the challenged statute" so that we "know[] what the

3

statute covers." *Williams*, 553 U.S. at 293.  Then, at the second step, we examine "whether the statute, as we have construed it, criminalizes a substantial amount of protected expressi[on]." *Id.* at 297.  As a practical matter, however, the first step does most of the analytical work.  If we construe the statute broadly, as this Court does, then the natural, almost inevitable result of the second step is the conclusion that the statute is overbroad.[1] *See, e.g.*, *United States v. Sineneng-Smith* (*Sineneng-Smith I*), 910 F.3d 461 (9th Cir. 2018), *vacated*, 140 S. Ct. 1575 (2020).  On the other hand, if we construe the statute narrowly, as the Supreme Court tells us to, then the Court is more likely to find that the statute passes muster.  *Cf. Williams*, 553 U.S. at 297; *United States v. Yung*, 37 F.4th 70 (3d Cir. 2022).  In this case, the outcome is largely determined by how the Court construes two words: "encourage" and "induce."

This Court makes two fundamental mistakes in its construction of § 1324(a)(1)(A)(iv).[2]  First, it misinterprets the meaning of the words "encourage" and

---

[1] The Court views this statement as the dissent recognizing that if the Court's reading of § 1324(a)(1)(A)(iv) is correct, then the statute would be overbroad.  *See* Slip Op. at 26 n.23.  It is worth noting, however, that the Court's criticism of the dissent likewise does not suggest that if my reading is correct, then the statute would pass constitutional muster. *See id.* at 17–18, 26 n.3.  The disagreement between the opinions therefore reflects two fundamentally different views of the statute.  Today, the Court rejects my reading of § 1324(a)(1)(A)(iv) just as I think it is clear that the Court's reading is incorrect and fails to comply with the Supreme Court's instructions.

[2] The root of these errors is the Court's decision to rely on two questionable cases from the Ninth Circuit, *Sineneng-Smith I*, 910 F.3d 461 and *United States v. Hansen*, 25 F.4th 1103 (9th Cir. 2022).  *Sineneng-Smith I* is a cautionary tale of judicial misadventure.  There, the Ninth Circuit manufactured an overbreadth challenge to § 1324(a)(1)(A)(iv) sua sponte and invalidated it.  *See Sineneng-Smith I*, 910 F.3d at 467–69.  The Supreme Court repudiated that decision because the Ninth Circuit "departed so drastically from the

"induce." Second, it erroneously concludes that § 1324(a)(1)(A)(iv) covers both civil and criminal violations of immigration law.

As the Court correctly notes, "[t]he starting point in interpreting a statute 'must be the language employed by Congress, and we assume that the legislative purpose is expressed by the ordinary meaning of the words used.'" *FTC v. Kuykendall*, 466 F.3d 1149, 1154 (10th Cir. 2006) (quoting *Hain v. Mullin*, 436 F.3d 1168, 1176 (10th Cir. 2006) (en banc) (Briscoe, J., dissenting)). "But no statute is an island unto itself." *United States v. Brune*, 767 F.3d 1009, 1022 (10th Cir. 2014). We therefore look at the context of the broader statutory scheme. *Id.* In doing so, we should not lose sight of the statutory purpose. *See Exby-Stolley v. Bd. of Cty. Comm'rs*, 979 F.3d 784, 798 (10th Cir. 2020) (en banc) (recognizing that examining statutory purpose "is one of the traditional 'tools' of statutory construction").

Section 1324(a)(1)(A)(iv) makes it a crime to "encourage[] or induce[] an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of law." What does it

---

principle of party presentation as to constitute an abuse of discretion." *Sineneng-Smith II*, 140 S. Ct. at 1578. Nevertheless, the Court emphasized the extreme nature of finding a statute overbroad and questioned the Ninth Circuit's use of hypotheticals. *Id.* at 1581 ("Nevermind that Sineneng-Smith's counsel had presented a contrary theory of the case in the District Court, and that this Court has *repeatedly warned* that 'invalidation for First Amendment overbreadth is strong medicine that is not to be casually employed.'" (emphasis added) (cleaned up) (quoting *Williams*, 553 U.S. at 293)). Undeterred, the Ninth Circuit resurrected *Sineneng-Smith I* by substantially adopting its reasoning in the recent *Hansen* decision. *See Hansen*, 25 F.4th at 1107. This Court in turn relies extensively on *Hansen* to support its decision. Because of this symbiosis, *Hansen* is wrong for the same reason the Court's decision is wrong—it fundamentally misconstrues the statute.

mean to "encourage" and "induce"?  An ordinary definition of the word "encourage" might be, as the Court suggests, "[t]o give courage to: inspire with courage, spirit, or hope: hearten."  Slip Op. at 11 (quoting Webster's Third New International Dictionary 747 (Philip Babcock Gove ed., 1961)).  But that definition is somewhat vague.  In keeping with the principles of statutory construction, we should strive to find a more precise definition of the word that still comports with its ordinary meaning.  We can find such a definition in the very same dictionary: "to spur on: stimulate: incite."  Webster's Third New International Dictionary, *supra*, at 747.  Likewise, the Court defines "induce" as "to move and lead (as by persuasion or influence)" and "to inspire, call forth, or bring about by influence or stimulation."  Slip. Op. at 11 (quoting Webster's Third New International Dictionary, *supra*, at 1154).  The Court omits, however, a more precise definition between the two: to "prevail upon: influence, persuade."  Webster's Third New International Dictionary, *supra*, at 1154.

Armed with these commonplace, more precise definitions, we can begin to consider their specific meaning within the statute.  In doing so, we must remember that § 1324(a)(1)(A)(iv) is a *criminal* statute.  The first question we must ask, then, is what does it mean to "spur on: stimulate: [or] incite" in the criminal context?  *Id.* at 747.  We can state it succinctly: for the purposes of § 1324(a)(1)(A)(iv), to "encourage" is "to incite to action." *Encourage*, Black's Law Dictionary (10th ed. 2014).  As for "induce," what does it mean to "prevail upon: influence, [or] persuade" someone?  Webster's Third New International Dictionary, *supra*, at 1154.  It means to "entic[e] or persuad[e] another person to take a certain course of action." *Inducement*, Black's Law Dictionary (10th ed. 2014).  Based on

6

these definitions, the words "encourage" and "induce" are analogous to the word "solicit," which when ordinarily defined means "to move to action." Webster's Third New International Dictionary, *supra*, at 2169.

Equating "encourage" and "induce" with "solicit" is consistent with the remainder of § 1324(a)(1)(A)(iv)'s language. After all, the statute makes the "coming to, entry, or residence . . . in violation of law" the object of the crime. The act described in the statute is inherently one of solicitation because it requires the perpetrator to "encourage[] or request[] another person to engage in specific conduct that would constitute such crime" "with the purpose of promoting or facilitating its commission." Model Penal Code § 5.02(1) (Am. Law Inst. 1985).

With this understanding, the meaning of § 1324(a)(1)(A)(iv) falls into sharp relief. Certain principles necessarily accompany the concept of a solicitation statute. Chief among them is the mens rea requirement. It is a generally held principle at common law that solicitation statutes carry a specific intent requirement. *See Intent: Specific Intent*, Black's Law Dictionary (10th ed. 2014) ("At common law, the specific-intent crimes were . . . solicitation."); 2 Wayne R. LaFave, Substantive Criminal Law § 11.1(c) (3d ed. Dec. 2021 Update); Model Penal Code § 5.02(1) ("A person is guilty of solicitation to commit a crime if with the purpose of promoting or facilitating its commission he commands, encourages or requests another person to engage in specific conduct that would constitute such crime or an attempt to commit such crime or would establish his complicity in its commission or attempted commission."); *see also* 18 U.S.C. § 373(a) ("Whoever, with *intent that another person engage in conduct constituting a felony* . . . solicits . . . ." (emphasis added)). That

7

is, the perpetrator must intend "to accomplish the precise criminal act [he] is later charged with," in this case that the target of the solicitation carry out the act in question. *See Intent: Specific Intent*, Black's Law Dictionary (10th ed. 2014).

This Court should apply this principle to § 1324(a)(1)(A)(iv) and read it as imposing a specific intent requirement. Were Congress to impose a general intent requirement, as this Court's reading of the statute implies, it would almost certainly criminalize some form of protected speech because the speaker would only need to intend to speak, rather than intend to induce a criminal act. And Congress has a clear pattern of imposing a specific intent requirement when criminalizing forms of speech so as not to infringe upon the First Amendment. *See, e.g.*, 18 U.S.C. § 1001 (making it a crime to "knowingly and willfully" lie to or mislead a government entity); 18 U.S.C. § 1621 (requiring a defendant to "willfully . . . state[] or subscribe[] any material matter which he does not believe to be true" to be convicted of perjury). Conceptually, that pattern makes perfect sense—imposing a specific intent requirement avoids the problem of targeting protected speech because the mens rea requirement ensures that the speech is "integral to criminal conduct" or fraudulent. *See Stevens*, 559 U.S. at 468; *see also United States v. Alvarez*, 567 U.S. 709, 733 (2012) (Breyer, J., concurring in the judgment) ("[T]he Court emphasizes *mens rea* requirements that provide 'breathing room' for more valuable speech by reducing an honest speaker's fear that he may accidentally incur liability for speaking.").

Other principles of statutory construction also support reading § 1324(a)(1)(A)(iv) as a solicitation statute. For example, the Supreme Court recognizes that some principles of criminal law are so well established that Congress does not need to specifically reference

8

them in statutory language. *See Morissette v. United States*, 342 U.S. 246, 261–62 (1952).

Because solicitation is inexorably linked with a requirement of specific intent, Congress

does not necessarily need to state that specific intent is required so long as it makes clear

that the statute criminalizes solicitation. *See id.* But even if the statute's mens rea

requirement is ambiguous, such "ambiguity concerning the ambit of criminal statutes

should be resolved in favor of lenity." *Rewis v. United States*, 401 U.S. 808, 812 (1971)

(citing *Bell v. United States*, 349 U.S. 81, 83 (1955)); *see also* Model Penal Code § 2.02(3)

("When the culpability sufficient to establish a material element of an offense is not

prescribed by law, such element is established if a person acts purposely, knowingly or

recklessly with respect thereto."). Here, resolving the ambiguity in favor of lenity entails

imposing the strongest mens rea requirement available—namely specific intent. It also

happens to be the logical choice for a solicitation statute.[3]

That leads us to the Court's second error. According to the Court,

§ 1324(a)(1)(A)(iv) makes it a crime to encourage or induce *both* civil and criminal

violations of immigration law. Slip Op. at 15. Based on this conclusion, the Court reasons

that the statute cannot be a solicitation statute because, as a general matter, solicitation

statutes only make it a crime to encourage or induce criminal violations. *See id.* at 15–16.

But once again, the Court ignores its obligation to consider a reasonable limiting

construction that could avoid this issue entirely. *See Ferber*, 458 U.S. at 769 n.24. As

---

[3] Although this reading of § 1324(a)(1)(A)(iv) is the best one available to the Court, it need not be. A limited construction of a statute only needs to be "plausible" because a plausible constitutional reading of a statute is preferrable to a "better" one that is overbroad. *Yung*, 37 F.4th at 79–80.

Professor Eugene Volokh persuasively argued in an amicus brief, the statute's phrase "in violation of law" refers to *criminal* violations of immigration law such as illegal entry into the United States in violation of 8 U.S.C. § 1325(a), and residing in the United States *after* having been deported in violation of 8 U.S.C. § 1326(c).  Br. of Prof. Eugene Volokh as *Amicus Curiae* in Supp. of Plaintiff-Appellee at 3–6, *Sineneng-Smith I*, 910 F.3d 461 (No. 15-10614).

Granted, the Government does not endorse this interpretation of the statute.  The Government argues § 1324(a)(1)(A)(iv) encompasses acts of facilitation in addition to acts of solicitation.  *See* Br. of Appellant 20–29.  That argument is unpersuasive given the language's clear support for solicitation.  The Government also appears to attempt—perhaps with the objective of finding the broadest interpretation of § 1324(a)(1)(A)(iv) that could pass constitutional muster—to construe the statute as only having a "general criminal intent" requirement (whatever that is) and points us to cases from several of our sister Circuits that it claims support such a conclusion.  *Id.* at 28–29.  The Government's reliance on these cases, however, is misplaced.  One of them, *United States v. He*, 245 F.3d 954 (7th Cir. 2001), supports the conclusion that the statute imposes a specific intent requirement.[4]  Another case the Government cites, *United States v. Zayas-Morales*, 685

---

[4] The Seventh Circuit implicitly endorsed the idea that § 1324(a)(1)(A)(iv) has a specific intent requirement in *He*, 245 F.3d 954.  There, the court considered the appropriateness of a supplemental jury instruction given by the district court in a case where the defendant had been charged under § 1324(a)(1)(A)(iv).  The jury instruction in question stated: "'[E]ncourage' means to knowingly instigate, help or advise.  'Induce' means to knowingly bring on or about, to affect, cause or to influence to an act or course of conduct."  *Id.* at 957.  The district court also expressly rejected the idea that § 1324(a)(1)(A)(iv) encompasses aiding and abetting.  *Id.*  The Seventh Circuit held that the "instruction was a

F.2d 1272 (11th Cir. 1982), addresses a previous version of the statute and arguably does more to confuse the distinction between specific intent and general intent than clarify it.[5] Lastly, *United States v. Nguyen*, 73 F.3d 887 (9th Cir. 1995), addresses neither § 1324(a)(1)(A)(iv) specifically nor solicitation. The Government's decision to present unpersuasive arguments does not justify our decision to invalidate a statute that is plainly salvageable through an alternative and equally reasonable construction. *Yung*, 37 F.4th at 79–80 (choosing a "plausible" narrow reading of a statute over a "better" broader reading to preserve its constitutionality).

In the end, how should this Court construe the statute? We can answer that question easily—§ 1324(a)(1)(A)(iv) makes it a crime to solicit criminal violations of immigration law. Under this reading, § 1324(a)(1)(A)(iv) imposes two clearly defined and narrow requirements. First, the perpetrator must specifically intend to "encourage[]" or "induce[]" (whether by speech or conduct) a criminal violation of immigration law. § 1324(a)(1)(A)(iv). Second, the perpetrator must have knowledge or a reckless disregard of the factual circumstances that would make the underlying act of the other person a

---

correct statement of the law." *Id.* at 959. Thus, the Seventh Circuit's reading of § 1324(a)(1)(A)(iv) as requiring a defendant to "knowingly" "encourage" or "induce," is analogous to a reading of specific intent.

[5] *Zayas-Morales* stated that a subsection of a prior version of § 1324 required "general criminal intent." 685 F.2d at 1276. The Eleventh Circuit relied on *Morrissette* to read this mens rea requirement into the then-applicable § 1324(a)(1). *See id.* at 1276–78. The Eleventh Circuit did not specify what it meant by "general criminal intent," and one of the footnotes in the case appears to confuse general intent and specific intent requirements. *See id.* at 1277 n.5. In any event, we need not wade into this confusion because the case does not address the applicable form of the statute.

11

criminal violation of immigration law. *Id.* As such, any speech subject to prosecution under § 1324(a)(1)(A)(iv) falls squarely within what the Supreme Court recognizes is speech "integral to criminal conduct," a category that is not protected by the First Amendment. *Stevens*, 559 U.S. at 468.

The Court's concerns about criminalizing innocent civil violations of immigration law are therefore misplaced. The relative encouraging the family member to commit a civil violation of immigration law by overstaying a visa need not fear § 1324(a)(1)(A)(iv). Slip Op. at 25. Even the case of an immigration lawyer "providing certain legal advice to [noncitizens]," *id.* at 25 (alteration in original) (quoting *Hansen*, 25 F.4th at 1110), falls outside the statute's reach. An immigration attorney would only face prosecution under § 1324(a)(1)(A)(iv) if he knowingly or recklessly solicited a client to commit a criminal violation of immigration law—an act that is not afforded protection under either the First Amendment or the attorney-client privilege. *Stevens*, 559 U.S. at 468; *Clark v. United States*, 289 U.S. 1, 15 (1933). This Court has no reason to rely on these "fanciful hypotheticals" or declare § 1324(a)(1)(A)(iv) unconstitutionally overbroad. *Williams*, 553 U.S. at 301.

Today's decision endorses an unjustifiable application of the overbreadth doctrine. The Court construes § 1324(a)(1)(A)(iv) in a way that sets the statute up for failure. Having done so, it rejects reasonable alternative interpretations and declares the statute unconstitutionally overbroad.

III.

Outcomes like the one the Court reaches today are inevitable under the overbreadth doctrine. After all, the doctrine rejects the idea that as-applied challenges are sufficient to vindicate First Amendment rights. *See Dombrowski v. Pfister*, 380 U.S. 479, 486 (1965) ("The assumption that defense of a criminal prosecution will generally assure ample vindication of constitutional rights is unfounded in such cases."). Instead, "[i]t allows a litigant without a legal injury to assert the First Amendment rights of hypothetical third parties, so long as he has personally suffered a real-world injury." *Sineneng-Smith II*, 140 S. Ct. at 1587 (Thomas, J., concurring). When courts are allowed to stray into the world of hypotheticals, results are only limited by judges' imaginations. These issues, however, are for the Supreme Court to consider. Despite the inherent flaws in the overbreadth doctrine, we are bound by it. Even with those flaws, we still could have reached a different conclusion in this case by properly following the guidance we have received from the Supreme Court. Ultimately, responsibility for our failure to follow those instructions rests with us. For the foregoing reasons, I respectfully dissent.